SAXLEHNER v. EISNER & MENDELSON CO. SAME v. SIEGEL-COOPER CO. SAME v. GIES. SAME v. MARQUET.

(Circuit Court, S. D. New York. June 28, 1898.)

1. PRINCIPAL AND AGENT—CONTRACT RELATION.

A contract whereby the owner of a well of mineral water in Europe "abandoned" to a certain corporation the exclusive sale thereof in this country—the corporation to pay him specified prices for the water, and take a specified number of bottles yearly, agreeing to sell no other similar waters—creates the relation of buyer and seller, and not of principal and agent.

2. TRADE-MARKS—ABANDONMENT.

The owner of wells of bitter water in Hungary, which water was sold in Europe under the name "Hunyadi Janos," by contract gave to a corporation the exclusive right to sell the same in this country. For several years the company sold large quantities here, until the name had in fact become an established trade-mark. The owner of the wells failed, however, to suppress in Europe the use of "Hunyadi" as a prefix to the names of other competing waters, and, partly in consequence thereof, certain suits instituted in this country for infringement were voluntarily dismissed, and the use of the name became common by competitors; and thereafter the corporation selling the water here published notices stating that "Hunyadi" had become a general name for bitter Hungarian waters, and that it would henceforth distinguish its "Janos" water by a red diamond on the label, which was done for several years, and until the termination of the contract. *Held*, that this was an actual abandonment of the term "Hunyadi" to competitors, who invested money in reliance upon such assertions, so that, although the owner of the wells finally established an exclusive right to the word in Hungary, he could not, after the termination of the contract, assert such a right here.

3. SAME—ABANDONMENT OF LABELS.

Where a corporation, having an exclusive right to sell certain European mineral waters in this country, neglected for four or five years to take any action against persons using infringing labels on competing waters, to the use of which labels the European owner had an undoubted exclusive right, *held*, that this was not an abandonment of the label, as against the owners of the well, after the termination of their contract with such corporation.

4. SAME—INFRINGEMENT—INJUNCTION.

One who, after using an infringing label for some time, discontinues it merely for financial reasons, still claiming a right to use it, should be enjoined.

**5. SAME—INFRINGEMENT BY RETAILERS.**
   A retailer, whose clerks, on receiving requests for a particular brand of goods, wrap up and deliver competing goods, will be enjoined.

These were four suits in equity brought by Emilie Saxlehner against the Eisner & Mendelson Company, the Siegel-Cooper Company, Rudolph Gies, and Louis Marquet, to enjoin an improper use of trademarks and labels in connection with certain Hungarian mineral waters.

Antonio Knauth, for complainant.

Edmund Wetmore and Charles G. Coe, for defendants.

SHIPMAN, Circuit Judge. These four bills in equity were brought to restrain the improper use of the complainant's trade-marks and labels; and, in the three cases against retailers, to restrain the fraudulent sale of the water from wells not of the complainant as the product of the wells which she owns. The jurisdiction of the court is founded upon the citizenship of the parties. The complainant resides at Budapest, in the kingdom of Hungary, and is a subject of the king of Hungary. The Eisner & Mendelson Company is a corporation of the state of West Virginia, and transacts its entire business in New York City. The other three defendants are residents of the city of New York, and citizens of the state of New York.

The following facts, which were alleged in the bills of complaint, or which are incidental thereto, were clearly proved:

Andreas Saxlehner in about the year 1863 commenced to bottle the waters of a well of bitter water owned by him, situated within the city limits of Budapest, Hungary, and, for the purpose of distinguishing the bitter waters of this spring from other waters then known and on sale, adopted in 1865 the arbitary name or trade-mark of "Hunyadi Janos" for the water of his spring. Hunyadi Janos, or John of Hunyad, was a Hungarian hero who lived in the fifteenth century. The business soon increased; additional wells were sunk by him in the same territory, which gave forth similar water; and in the course of time the water was exported beyond the limits of Hungary,—to other countries of Europe, and also to the United States. When Saxlehner commenced this business he adopted a characteristic and novel style of bottles; the same being of a straight shape, with a short neck, to the top of which was attached a metal capsule bearing the inscription, "Hunyadi Janos, Budai Keseruviz" (meaning Hunyadi Janos, Bitter Water of Buda), together with a portrait, supposed to be the portrait of the hero, stamped therein, and a novel and peculiar label, covering almost the whole body of the bottle, the characteristic features of which were a division of the same into three longitudinal fields; the middle field bearing the said portrait in a medallion, with the name "Hunyadi Janos" written in large letters on the top part of the label,—the color of the middle field being red. As this water was exported to and sold in the various countries of the world, a different custom concerning its appellation sprung up in different countries; the Latin races using the word "Janos" as the common appellation of the water, it being known as "Eau de Janos," or "Aqua di Janos," while in England

and the United States of America the name "Hunyadi" became its common appellation, it being known as "Hunyadi Water."

In the month of March, 1876, Andreas Saxlehner made a contract with the Apollinaris Company, Limited, of London, by which he gave it the exclusive opportunity of selling his Hunyadi Janos water in Great Britain, the United States of America, and other transmarine countries, for a term of years, which terminated finally on March 25, 1896. About this time a label was designed, to be used on the bottles which were to be sold by the Apollinaris Company, Limited, of substantially the same contents and characteristic features, but of a different color; the body of the label being a blue color, retaining, however, the red color of the central field. A narrow strip on top of the label was added, containing the imprint of the Apollinaris Company as importers; and ever since the making of this contract large quantities of Hunyadi Janos water, bearing this blue and red label, were exported to the United States, and sold here,—the water being ordered and sold under the short name "Hunyadi," or the full name "Hunyadi Janos." In the year 1889 Andreas Saxlehner died, whereupon his widow, the complainant, succeeded him in the business of bottling and exporting the Hunyadi Janos water; and since the termination of the contract with the Apollinaris Company, Limited, she has continued to export to the United States, and sell here, the Hunyadi Janos water in the same bottles, and with substantially the same labels, the name of her firm being substituted in place of that of the Apollinaris Company on the labels. In the year 1887 Andreas Saxlehner caused the name "Hunyadi" to be registered as his trade-mark for natural aperient waters in the United States patent office. By reason of the great care exercised by complainant and her predecessors in business in bottling it, the water has become widely and favorably known, and is commonly designated by consumers in the United States as "Hunyadi Water." Until the year 1890 complainant did not enjoy adequate protection in Hungary in the use of her trade-marks and labels, on account of a lack of statutes regulating such matters, by reason of which fact other persons in Hungary and in Europe used the name "Hunyadi" in connection with other names, imitating her labels, capsules, and bottles; and she was unable to stop these practices. Since 1890 the law of Hungary has been changed, and she has succeeded in causing all these marks and labels to be suppressed in Hungary, including also the use of the names "Hunyadi Laszlo" and "Hunyadi Matyas." The bill of complaint complained of two different kinds of labels used by defendants in the sale of Hungarian bitter waters; one being marked with the name "Hunyadi Matyas," while the other is marked with the name "Hunyadi Laszlo"; both labels being otherwise closely similar to complainant's label in their color, size, shape, and general arrangement; stress being laid upon the tripartite division already described, the medallion portrait on the center label, the blue and red color, the name "Hunyadi," and also the similarity of the capsules used on both bottles, the bottles being of the same size and shape. It is alleged that these were adopted by the defendants with full knowledge of the complainant's rights, and for the purpose of imposing upon the public, and depriving the complainant of the ben-

efits of her business. The bill of complaint, thus, is of a twofold character; being brought for infringement of trade-mark rights of the complainant, and also to enjoin an unfair competition by means of simulated labels and insignia of trade. A decree for permanent injunction, damages, profits, and costs, was prayed for.

The wells of Andreas Saxlehner, which finally became 112 in number, are situated in the valley of Orsod, near the inhabited part of the city of Budapest, and cover an extent of 100 acres, and produce an aperient water. In 1873 one Ignatius Markus, the proprietor of a spring of bitter water in Budapest, applied to the city authorities for permission to call the spring and its water by the name "Hunyadi Matyas," and to register this name as a designation of the water. This application was successfully opposed by Saxlehner before the local authorities, but the decision was reversed upon appeal to the minister of agriculture, who held that the two names were sufficiently distinct, and that it sufficiently appeared that the waters of the springs were of the same quality, and granted Markus' petition. Afterwards this spring was registered in Budapest by the name of "Hunyadi Matyas." Thereupon the proprietors of other wells commenced to sell their waters in Europe under the name of "Hunyadi," with some added name, with the use of a close imitation of the red and white labels. Saxlehner made in 1887 another unsuccessful attempt to stop the employment of the name "Hunyadi" when applied to the water called "Hunyadi Joseph"; his Hunyadi Janos water had been sold by him in the United States, under the red and white label, to a limited extent, before March, 1876, when he made his contract with the Apollinaris Company of London. By the contract he "abandoned" to that company the exclusive sale of his Janos water in this country. It was to pay specified prices. It agreed to take yearly 100,000 half or entire bottles, and to sell no other bitter water. The goods were to travel at its risk. Saxlehner was to furnish careful package and faultless bottling. Upon the red part of the label there was a warning, signed by Saxlehner, that "imitation of this water, or of the label, or of the capsule, will be the subject of legal proceedings at the instance of the Apollinaris Company," but the company did not agree to institute such proceedings. The contract was for 10 years, and was afterwards extended for 25 years, beginning January 1, 1876, but the company could withdraw upon 12 months' notice. Saxlehner had no such right of cancellation. The company went on in the business of selling Janos water in the United States without a competitor of importance until 1886, and succeeded in developing a very large business, and the water had secured for itself a high popular and medical reputation under the short name "Hunyadi." In 1886 Mattoni & Wille, of Budapest, consigned to one Andres, in New York, 121 cases of their Hunyadi Matyas bitter water. This firm had bought four springs in Budapest, one of their purchases being the original Markus spring; and in 1877 they registered in Hungary four trade-marks for four several wells, viz. Szcihényi, Deak, Sz-Istvan, and Hunyadi Matyas. Ignatz Ungar & Son became in 1880 the owner of a Budapest spring, which they called "Hunyadi Arpad," and registered the name in Hungary, and in 1886 began to sell the water from

it in New York City through Joseph Ungar, as their agent. This water was put up in an imitation of Saxlehner's red and blue labels. The Matyas, bearing the words "Hunyadi Mathias Quille" in small print, was put up in red and white labels. Suits were promptly, and before Andres had an opportunity to sell his lot, commenced in 1886 in the United States circuit court for this district by the Apollinaris Company against these agents, to enjoin against the use of the trade-name "Hunyadi," and of the labels, but were withdrawn on the ground of want of jurisdiction; and two suits (one against Andres, and the other against Ungar) were brought by the Apollinaris Company, in the supreme court in the city of New York. Ex parte injunctions were issued in each case in February, 1887, and remained in force until July, 1888, when, on application of the defendant in the Ungar Case, the injunction in that suit was dissolved, no one appearing in opposition; and soon after the injunction in the Andres suit was dissolved without objection, and the suit was voluntarily discontinued. An attempt was made by the Eisner & Mendelson Company to show that the Apollinaris Company notified Saxlehner of the pendency of the motion to dissolve the injunction in the Ungar Case, and his refusal to assist in the opposition; but the offered testimony was merely hearsay, and was inadmissible. After the dissolution of these injunctions, the Hunyadi Arpad and the Hunyadi Laszlo waters were sold in this country by the agent of Ungar until 1892, who also sold the Hunyadi Bela water to a limited extent,—all under the general name of "Hunyadi," and with the imitation red and blue label. The Arpad water was extensively advertised. The sale of the Matyas water was not renewed, but the quantity on hand was disposed of under changed labels. The Apollinaris Company published in April 6, 1889, and thereafter in 1889 and 1890, the following advertisement:

"The Apollinaris Company, Limited, London, beg to announce that. as numerous aperient waters are offered to the public under names of which the word 'Hunyadi' forms a part, they have now adopted an additional label, comprising their registered trade-mark of selection, which consists of a red diamond. This label will henceforth also serve to distinguish the Hungarian aperient water sold by the company from all other aperient waters."

After April, 1889, and until the cancellation of the contract in 1896, this company placed upon each bottle of Janos water which it sold in this country a red diamond, containing these words:

"The red diamond is the trade-mark of the Apollinaris Company, Limited, and is meant only to indicate that the mineral waters so marked are sold by the Apollinaris Company, Limited."

In 1886 or 1887 the Apollinaris Company purchased a spring of bitter water, under the name of "Apenta," in Budapest, and, immediately upon the dissolution of the contract, began to push the sale of this water in this country and in England, under the name of "Apenta from the Uj (New) Hunyadi Springs at Budapest," with the red diamond label. Its use of the word "Hunyadi" was stopped by injunction in England in June, 1897, and was abandoned in this country.

The Eisner & Mendelson Company of Pennsylvania, the predecessor of the present defendant, which was organized in April, 1892, and

succeeded to all the business and contracts of its predecessor, made a contract, dated July 30, 1889, with Heinrich Mattoni, the owner of the springs, the water of which had been sold by Mattoni & Wille, by which it obtained the sole agency for the United States and Canada for the sale of the bitter waters which he owned, for the term of 20 years from September 1, 1889. Eisner, who acted for the Eisner & Mendelson Company, saw half a dozen different Mattoni labels, but devised a new one for the American market, and imported some 20,000 bottles in 1889 and 1890 under the name "Royal Hungarian Bitter Water," upon a red and white label. In July, 1890, the Eisner & Mendelson Company took a lease for 5 years, with an option for a renewal for 20 years thereafter, from Mattoni, of the so-called "Hunyadi Matyas Spring, No. 2," and became entitled to have all the bitter water for its American use bottled from this spring. This lease superseded the previous contract. The reason which induced Eisner to make this lease was his desire to control the American label, so that neither Mattoni & Wille nor European purchasers could interfere with the American trade. A new label was therefore forthwith devised by Eisner, which was a reddish brown and blue label, and is described in the complaint, containing the name "Hunyadi Matyas," "Buda Keserwirz," and a medallion portrait of King Stephen in the center of the red division. He intentionally simulated the Saxlehner United States label, for the purpose of obtaining, by means of the simulation, a part of the good will which the Janos water had gained. This "Matyas Spring, No. 2," was not the original Matyas spring, in regard to which Markus had his litigation in 1873, but was another spring, called the "Franz Deak Spring," which Mattoni & Wille bought in 1876 from Michael Ivanyi and wife, and was the spring registered in 1877 under the name "Deak." In May, 1890, the Eisner & Mendelson Company commenced vigorous measures to advertise this water, and introduce it, through circulars and newspapers and sample bottles, to druggists and to physicians. It was extensively advertised as a Hunyadi water, and, being sold below the market price of the Janos water, has been largely bought, especially by druggists who receive the custom of the class which desires economy. On May 2, 1892, the present Eisner & Mendelson Company entered into a contract with Ignatz Ungar & Sons for the sole agency in the United States of their waters from four Hungarian springs,— the Hunyadi Arpad, Hunyadi Bela, Victoria, and Racoczy Georgy,— and acquired by purchase from Perrine & Co., the Ungar agents in New York, their rights under the contract which they had held. In April, 1892, it acquired from a Paris corporation the exclusive right to the sale in this country of a Hungarian bitter spring water called "Hunyadi Laszlo." These various waters, with the exception of the Victoria and the Georgy, were sold under the name "Hunyadi," and with the red and blue label. In April, 1893, the Apollinaris Company, for the purpose of counteracting the idea that the Eisner & Mendelson Company had become lessees of all the Hunyadi springs, issued an advertisement and postal cards, of which the following is the important part:

"Before any Hunyadi water was practically known in the United States, the Apollinaris Company, Limited, of London, widely and successfully introduced

the Hunyadi Janos water; the proprietor in Buda Pest of the springs having intrusted to them, for a term of years still unexpired, the sole sale of this water in England, and in all transmarine places. Hunyadi Janos water having become very popular, quite a number of other waters are now offered for sale under names of which the word 'Hunyadi' forms part, and in bottles and with labels closely resembling in appearance and color those long used for Hunyadi Janos water. The word 'Hunyadi' having become a general name for Hungarian bitter waters,—good, bad, or indifferent,—the Apollinaris Company affixed to the bottles of Hunyadi Janos, the Hungarian bitter water of which they have still the sole sale, a small, yellow label, with their red diamond; the object of this trade-mark being only to indicate to the public that the bottle so labeled is sold by the Apollinaris Company, Limited."

On July 6, 1893, the complainant bought from Ignatz Ungar & Sons the Ungar springs, the Ungar contract with the Eisner & Mendelson Company was terminated, and the importation of those waters ceased. In 1895 or 1896 the defendant ceased to import the Laszlo waters. In 1893 the Eisner & Mendelson Company began to use, and has used ever since, upon their standard bottles of Matyas water, an additional label, consisting of a red seal upon a white ground, and containing the words:

"Ask for the seal brand. This label has been adopted to protect the public from imitation, and as a guaranty of the genuineness of the Hunyadi Matyas water, imported solely by Eisner & Mendelson Co., New York."

The attention of druggists had been called to this seal brand by advertisements in the trade papers. The Mattoni lease was renewed for 20 years from March 1, 1895. The Apollinaris Company, during the continuance of its Saxlehner contract, did not object to the Eisner & Mendelson Company's operations or trade-marks or representations, except in one particular, which was changed at the former's request.

The following table, compiled by the agent of the Apollinaris Company from the Journal of Commerce and Bonfort's Journal, which are considered to be authorities upon the subject of importations, states the number of cases of so-called "Hunyadi Water," other than Janos, reported in those journals to have been imported into the United States from 1886 to 1896, inclusive:

Importation into the United States of the Following Waters:

| NAME. | 1886 | 1887 | 1888 | 1889 | 1890 | 1891 | 1892 | 1893 | 1894 | 1895 | 1896 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Hunyadi Arpad | 201 | ......... | 1000 | 7649 | 7979 | 3752 | 4438 | 2882 | Jan 1 | to | Apl. 30 | 27,901 |
| " Corvin | | | | | 20 | | | | | | | 20 |
| " Matyas | | | | | 2590 | 4662 | 4531 | 1954 | 6210 | 5185 | 520 | 25,652 |
| " Laszlo | | | | | 200 | ......... | 397 | 264 | 936 | 268 | ......... | 2,065 |
| " Bela | | | | | | 397 | 268 | 284 | | | | 949 |
| " Jozsef | | | | | | 132 | | | 144 | | | 276 |
| " Lajos | | | | | | 667 | 2265 | 2772 | 5148 | 528 | ......... | 11,330 |
| " Miklos | | | | | | | | | 132 | | | 132 |
| " Vilmos | | | | | | | | | | 263 | ......... | 263 |

The figures given represent cases, each containing fifty (50) bottles.

In 1894, and in October, 1896, the Hungarian minister of commerce canceled all the Hunyadi Matyas trade-marks, and also five illustrated labels for Hunyadi Matyas bottles, and also canceled the Hunyadi trade-marks of all the claimants or users thereof, except the one belonging to the complainant. This action was taken upon her petition, and under authority of progressive Hungarian litigation on the subject in 1890 and in 1895; so that it is established in Hungary that the complainant is alone entitled to the use of the word "Hunyadi." This litigation was vigorously conducted by the complainant. The questions in regard to the right of the Eisner & Mendelson Company to the use of the name "Hunyadi," and of the Saxlehner label, depend upon circumstances which differ in important particulars. The Hunyadi question is by far the most important to the parties. In 1886, when substantial competition in the sale of Hunyadi bitter waters made its appearance in this country, the name "Hunyadi" was in fact the established trade-mark of the Janos water. In was prevented from taking that position in Hungary or in continental Europe by the decision of 1873, which declared that "Hunyadi Janos" and "Hunyadi Matyas" were different names. Whether, upon an attack, Saxlehner could have then maintained his right to have an exclusive use of the name in this country, is not now clear. The Apollinaris Company, having obtained ex parte injunctions, abandoned them in 1888, influenced in part, probably, by the failure of Saxlehner in the Hunyadi Joseph litigation of 1887, published their advertisement of 1889, which announced that their red diamond would serve to distinguish the Janos water, and again, in 1893, published a notice that the word "Hunyadi" had become a general name for Hungarian bitter waters of all varieties of excellence. Much reliance has been placed by the defendant upon these statements, upon the theory that they were made by the agents of Saxlehner. The Apollinaris Company was never an agent of the owner of the well. Their relations were those of seller and buyer. The company simply agreed to buy a specified number of bottles yearly, and to introduce no other bitter water. It did not agree to use any other efforts to protect the good will or the trade-marks of Saxlehner, or to use any efforts to promote his business or his pecuniary interests, and it could cancel the contract upon notice. Inasmuch as it was the sole person who had the right to sell the Janos water in this country, and to use its trade-mark, and to enjoy the good will of the business, it was in a position in which it could in fact destroy the name and the good will, if its own interest dictated such a course. In considering the reasons, legal and commercial, which induced the Apollinaris Company to publish its advertisements, and to rely upon its red diamond label, it is right to say that the history of the Hungarian litigation, and of the continental use of "Hunyadi," presented a legal reason, which was at least very plausible, for the conclusion that kindred waters could use the name anywhere, and served to embarrass a litigant in the attempt to enforce an exclusive right to it in the United States. Whatever may have induced the action of the Apollinaris Company, it did, notwithstanding the name had become localized here, abandon, in terms and pos-

itively, a claim to a right to its exclusive use, and affirmed that it had become, in practice, a general name. As the name had become in fact a trade-name in 1886, so, also, it could by affirmative and positive action cease to be such; and, when it had publicly become open to use by competitors, the persons who invested their money in the honest belief that the name was public property should have a fair standing in a court of equity. I am obliged to say that by the positive action of the corporation, which alone had the right to the enjoyment of the name in this country, and which had the right to bring suits for its protection, it became after 1888 one which dealers in Hungarian bitter waters could use as a prefix to the other specific name of the respective waters. They could not call their water "Hunyadi," but they could use the word as a prefix. Two causes contributed to this result: First, the action of the Hungarian authorities; and, secondly, the careless contract by which the Apollinaris Company entered into no contractual obligations to protect Saxlehner's interest or property.

The question in regard to the label is a different one. The red and blue label was Saxlehner's label in England and in this country. He devised it, and his sole right to its use was never entangled by any claim of a public right to use it wherever Hungarian bitter waters are sold; and before the injunctions were dissolved, in 1888, his exclusive right in this country was undeniable. After the dissolution it was used upon the Arpad water until July, 1893, when its further use was effectively stopped by the action of the complainant. It was not used upon the Matyas water until 1890, when the defendant abandoned the use of the Mattoni label, which it had devised, and assumed the insignia of the Janos water, with a simulated change of color from red to reddish brown. It is said, however, that the Apollinaris Company also abandoned to the public any claim to an exclusive right to a red and blue label. Its action in regard to the name was positive, but it neither asserted nor admitted anything in regard to the label. It simply did not act against its use upon the Arpad water, which, as the table of importations shows, was the only competitor of importance until 1890; nor against the Matyas, which did not come into the field with this label until July, 1890. The other waters whose names were frequently repeated in the record were of no importance as competitors, certainly until 1895, when the Apollinaris Company gave notice of its intent to cancel the contract. Its conduct in regard to labels was that of indifference and of laches, and can give no rights, as against the complainant, to the Eisner & Mendelson Company, who started in 1890 to use her label, and feigned to have avoided it. The charge of laches against the complainant or her predecessor is not adequately sustained. Neither of them could practically accomplish anything through litigation in this country until the cancellation of the Apollinaris contract. In November, 1895, the son of the complainant came to this country to take charge of his mother's business; and he has been active in litigation since the contract closed, and in October, 1896, notified the defendant of his proposed suit against it. The defendant has, however, since 1893, for the purpose of having a mark of its own,

and thus avoid the injurious effect of new competition, used a distinctive "seal brand," which is a red seal upon a white ground, large enough and peculiar enough to be easily recognized, and which informs the public, in substance, that the water is Matyas water, and is sold only by the defendant. Inasmuch as the name "Hunyadi" can be used in this country by rivals of the Janos water, I think that this label is a sufficient attempt on the part of the defendant to assert that it is the seller of Matyas water, and that since 1893 it frees the defendant from the charge which before that time was true,—that it was cajoling or deceiving the ordinary retail purchaser into the belief that he was buying the Janos water. This freedom applies only to the water sold under the seal brand. In the spring of 1896 the Eisner & Mendelson Company imported a few hundred cases of another kind of Matyas water, which was called "No. 3," and which they sold without the seal brand, and with "3" marked upon the red and blue label. It would not be an infringement, except for the use of the three well-known longitudinal red and blue fields of the Saxlehner label,—the field covering the whole bottle,— and the red field in the middle, with a medallion portrait. The company ceased to import this water, and it also ceased in 1895 or 1896 to import the Laszlo water, which was sold under its red and blue label; but it claims the right to sell these, or any other Hunyadi waters, under the simulated label of Saxlehner. It ceased to make these importations for financial reasons only. Let there be an interlocutory decree against further infringement of this label, and for an accounting for the damages occasioned by past infringements since April 13, 1892, the date of the organization of the defendant. The question of costs will be reserved until final decree.

The cases against retailers, which were based upon instances of a fraudulent sale of Matyas water, representing it to be Janos, were defended by the Eisner & Mendelson Company, and all the cases were presented in one record. There is no substantial evidence of fraudulent conduct on the part of Siegel-Cooper Company, and the bill is dismissed, without costs. The testimony in regard to sales at the retail drug stores of Rudolph Gies and Louis Marquet satisfies me that the clerk in charge at each of those stores, in response to special requests for Janos water, wrapped up and delivered bottles of the Matyas water of the Eisner & Mendelson Company. In each case the witnesses were evidently mistaken in regard to the figure and complexion of the clerk, but I have little doubt that the man in charge made the deliveries as testified. Their sales were probably not large enough to justify the expense of taking an account, but there should be in each case an injunction against a sale of Matyas water as and for the Janos water of the complainant, without costs.