### SAXLEHNER v. EISNER et al.

(Circuit Court, S. D. New York. September 28, 1905.)

1. TRADE-MARKS—SUIT FOR INFRINGEMENT—JURISDICTION OF EQUITY.

The fact that the infringement of a trade-mark had ceased before the commencement of a suit in equity therefor does not deprive the court of jurisdiction, where the bill alleges a threatened and intended continuance of such infringement, which allegation was justified by the facts.

[Ed. Note.—For cases in point, see vol. 27, Cent. Dig. Injunction, §§ 9, 10; vol. 46, Cent. Dig. Trade-Marks and Trade-Names, § 89.]

2. SAME—INFRINGEMENT BY CORPORATION—LIABILITY OF EXECUTIVE OFFICERS.

The executive officers of a corporation, who were large stockholders, and had full management of its affairs, and instigated and controlled its action °in willfully infringing complainant's trade-mark and simulating her labels, are jointly and severally liable with it for the infringement; and, where they directed and controlled its defense when sued therefor, the final decree in the suit is conclusive on them as to the matters adjudicated, including the damages found due complainant on an accounting, and a suit will lie against them to recover the amount of such decree from them individually, when, through their control and influence, they caused the corporation to transfer its property and to declare and pay dividends pending the suit against it, by which it was rendered insolvent.

In Equity.

Briesen & Knauth (Antonio Knauth, of counsel), for complainant.
Charles G. Coe (Alfred A. Cook, of counsel), for defendants.

HAZEL, District Judge. The bill is in equity for an accounting to enjoin the defendants from using in the sale of bitter waters labels in imitation of the labels used by complainant in the sale of waters commonly known as "Hunyadi Janos." The elicited facts and circumstances are unusual, and the propositions of law novel and interesting. Pending this bill Joseph Mendelson died in the year 1903, and the suit was revived in the name of the executrix. The object and purpose of the bill is to establish the personal liability of the defendants Moritz Eisner, the president, and Hattie Mendelson, as executrix of Joseph Mendelson, deceased, who was the treasurer, of the Eisner & Mendelson Company, a corporation of the state of West Virginia. As managing officers and directors, Eisner and Mendelson (hereinafter for convenience called the defendants) exclusively managed and controlled the affairs of the corporation. A judgment recovered in a

prior litigation brought by Emilie Saxlehner, the complainant herein, against Eisner & Mendelson Company (hereinafter called "the company"), amounting to $31,030.36, for fraudulently and wrongfully simulating the label previously appropriated by her, remains unpaid. The final decree of the Supreme Court of the United States, dated May 6, 1903, was the result of a vigorously contested suit, wherein complainant's exclusive right to the novel form of bottles and peculiar style of labels in question is recognized and established. The Supreme Court declared the acts of the company to have been an active and continuing fraud, and decreed that the company's bottles and labels were a clear infringement upon those of the plaintiff. Saxlehner v. Eisner & Mendelson Co., 179 U. S. 19, 21 Sup. Ct. 7, 45 L. Ed. 77. This suit was instituted on the heels of the Supreme Court decision, before an accounting was had as to the damage and profit which the company earned, and was to provide for the contingency that the judgment recovered against it in favor of complainant could not be collected.

The material matter alleged and in issue is that the defendants are individually liable as joint and several trespassers, and as such are concluded upon the facts in controversy by the decree of the court in the action against the company. It is undeniable that the defendants aided in the defense of that action, and, acting together, were the principal force in the unlawful preparation of the peculiar bottles and labels which infringed those used by the complainant in the sale of the waters above mentioned. The evidence shows that, knowing of Mrs. Saxlehner's prior rights, the defendants intentionally devised and profited by the infringing label and trade-mark. Judge Shipman, who heard the original proceeding in the Circuit Court, in his opinion reported in 88 Fed. 61, substantially holds that Moritz Eisner intentionally imitated the infringing label for the express purpose of obtaining, by means of the simulation, part of the good will which the Janos water had gained. The Supreme Court, in commenting upon the acts of the company, declared that its adoption of the simulated labels "seems to have been an act of undisguised piracy." The defendants were not joined as parties in the original proceeding. The bill alleges that, when the principal action was brought, the complainant was without knowledge of the active participation of the defendants in the fraudulent and wrongful acts adjudged to have been committed. In the bill it is not claimed that the company is insolvent, or that there is any reason for believing that complainant cannot obtain complete relief in the principal action. The answer avers that all the acts in relation to bottling and selling the Hunyadi waters were done by the defendants solely in their official capacity, and that they never owned, or had any interest personally in, the labels or sale of the bitter waters by the company. The defenses relied upon are lack of jurisdiction; that no accounting can be had in equity, as the defendants have not individually violated any rights of complainant; and that the testimony introduced regarding the company's insolvency subsequent to filing the bill is incompetent and irrelevant.

The objection to the jurisdiction of the court will first be considered. The proofs show that the company discontinued the use of the in-

fringing labels on November 1, 1900, just before the bill was filed. Accordingly, upon the authority of Root v. Railway Co., 105 U. S. 189, 26 L. Ed. 975, it is contended that jurisdiction in equity is lost; the remedy being at law. The testimony does not strictly agree as to the precise time of discontinuing the use of the infringing labels, but both sides, during the progress of the accounting, apparently accepted as correct the later testimony upon that point of the witness Eisner, and proceeded upon that assumption. The exact date, however, upon which the infringement ceased, in view of the evidential facts, is unimportant. The bill asserts a threatened continuance of the injury by the defendants, and, though in the light of subsequent events such apprehensions proved groundless, yet the company did not promptly obey the decision of the Supreme Court. Fifteen days elapsed after the decision was announced before the objectionable labels were actually destroyed and their use discontinued. Moreover, the aggravated and flagrant imitation of the labels in question, as shown in the prior Saxlehner Case, would seem to have completely justified the claim that further trespassing upon the complainant's rights was intended by the defendants. Assuming, therefore, that the use of such labels was stopped before the service of process, the court is not, in the peculiar facts presented, deprived of its equity power to afford adequate relief to the injured party. India Rubber Co. v. Rubber Comb, etc., 45 N. Y. Super. Ct. 258.

I do not think that the Root Case is a controlling authority here upon the question of jurisdiction. It was there held in relation to an expired patent, a patent in which the monoply had ceased, that the injured party had an adequate and complete remedy at law. It is true the enunciated principle was not confined to the specific subject-matter of the suit, and it apparently includes all classes of cases in which a cause of action is cognizable at law. Alger v. Anderson (C. C.) 92 Fed. 696. This controversy, however, for infringing a trade-mark or labels by which complainant's goods are distinguished from those of other dealers—a vested property right, which in fact can be used and transferred and sold as any other property—is not within the enumerated classification. It has been held that there is very little analogy between trade-mark property rights and patents for inventions. Canal Co. v. Clark, 13 Wall. 322, 20 L. Ed. 581. The rule invoked, as already intimated, is to hold the defendants individually accountable to pay the judgment recovered against the company, because of their personal contribution to the fraud, and their privity with the party defendant in the former litigation. As said in Peters v. Union Biscuit Co. (C. C.) 120 Fed. 679:

"The executive officers of a corporation, who necessarily inspire all its acts, cannot shield themselves behind an artificial, and sometimes irresponsible, creation from the consequences of their own acts, even though performed in the name of an artificial body."

Although that case was reversed upon appeal by the Circuit Court of Appeals, Eighth Circuit (125 Fed. 601), upon another point, the principle stated is thought to be the law. See, also, Glucose Co. v. St. Louis S. & P. Co. (C. C.) 135 Fed. 540.

In Lovejoy v. Murray, 3 Wall. 1, 18 L. Ed. 129, it was held to be well settled "that persons engaged in committing the same trespass are joint and several trespassers, and not joint trespassers exclusively. Like persons liable on a joint and several contract, they may all be sued in one action, or one may be sued alone, and cannot plead the nonjoinder of the others in abatement; and so far is the doctrine of several liability carried that the defendants, where more than one are sued in the same action, may sever in their pleas, and the jury may find several verdicts, and on several verdicts of guilty may assess different sums as damages." And it was further substantially held in that case that persons occupying this relation to a controversy are bound by the proceedings to which they are party, on the theory that there exists a community of interest in the subject-matter. Robbins v. Chicago, 4 Wall. 657, 18 L. Ed. 427; David Bradley Mfg. Co. v. Eagle Mfg. Co., 57 Fed. 980, 6 C. C. A. 661; Fish Bros. Wagon Co. v. Fish Bros. Mfg. Co., 95 Fed. 457, 37 C. C. A. 146.

In Walter Baker & Co. v. Sanders, 80 Fed. 889, 26 C. C. A. 220, it was decided that, where a decree for infringement is merely interlocutory, it is not conclusive in a suit by the same parties against an agent for the principal. This conclusion was an evident acquiescence in the general rule above stated.

In Tootle v. Coleman, 107 Fed. 41, 46 C. C. A. 132, 57 L. R. A. 120, it was held that:

"One who instigates another to do a wrongful act, and, when the wrongdoer is sued, takes upon himself and conducts the defense of the case, is concluded from again litigating with the plaintiff in that action the issues there decided."

In Estes v. Worthington (C. C.) 30 Fed. 465, it was held by Judge Wallace that:

"In torts of misfeasance, like the violation of a trade-mark, agents and servants are personally liable to the injured party. Bell v. Josselyn, 3 Gray, 309, 63 Am. Dec. 741; Richardson v. Kimball, 28 Me. 463; Mitchell v. Harmony, 13 How. 115, 14 L. Ed. 75; Phelps v. Wait, 30 N. Y. 78. All persons procuring or assisting in the commission of a trespass are principals in the transaction, and both the master who commands, and the servant who does, the act of trespass may be made responsible as principals, and may be sued jointly or severally for damages, as the injured party may elect."

The enunciated doctrine applies to stockholders of a corporation who are held privy to a proceeding touching the body of which they are members. Glenn v. Liggett, 135 U. S. 544, 10 Sup. Ct. 867, 34 L. Ed. 262. Such being the law, it follows that the final decree of the Supreme Court of the United States in Saxlehner v. Eisner & Mendelson Company was binding upon the defendants, and the evidence relating to their participation in the acts of infringement is res adjudicata.

The important inquiry is whether the infringements of the company were inspired and committed by the defendants jointly or severally, with the object of concealing their acts behind the corporation. Were the defendants joint tort feasors with the company? Are they liable to account for profits; it not being claimed in the bill that the company was insolvent or irresponsible? These questions are not free from dif-

ficulty. It is important to look at the nature and circumstances of the case, and, in order to make plain the crucial questions, the manner in which the infringing acts were committed must necessarily be considered. In the year 1899 the defendant Eisner, on behalf of the company, leased from one Mattoni the spring called "Hunyadi Matyas No. 2," located near the city of Budapest, Hungary, for a period of five years, with an option to renew for an additional twenty years. As the company had the right to all the bitter waters bottled from the spring, the same were consigned by the lessor in large quantities, and in bottles labeled in imitation of complainant's trade-mark, to the company engaged in business in the city of New York. Subsequently in 1895, at the request of the company, the waters were exported in cases containing bottles with a different style of label from that appropriated by the complainant. At this time the record shows Mattoni had been enjoined in Hungary at the instance of complainant, from using the infringing labels and bottles. Upon the arrival of the importation in the United States, the company, at the instigation of the defendants, with knowledge of the fact that the consignor had been so enjoined, relabeled such bottles with a label devised by the defendant Eisner in imitation of the label used by the complainant in the United States. Other springs were leased by the company, and infringing labels were used by it pursuant to the directions of the defendants. It appears by the evidence that the directors of the company permitted the defendants to exercise their individual judgment and discretion in all matters relating to the business. The pecuniary interest of the defendants in the subject-matter, and the apparent insolvency of the company, together with the transfer of its property to another corporation organized under the laws of New York, were shown upon the accounting.

A discussion of the evidence upon this point suggests the third objection urged in behalf of the defendants, namely, that such proof is not within the scope of the pleadings; no supplemental bill having been filed. This objection, however, is thought untenable. Giving consideration to the later evidence on the accounting in connection with that appearing in the principal action, the misconduct of the defendants and their motive are clearly shown. The facts would seem to directly bring this case within the exceptions pointed out in the following cases: Mergenthaler Linotype Co. v. Ridder (C. C.) 65 Fed. 853; Howard v. St. Paul Plow Works (C. C.) 35 Fed. 743; Bowers v. Atlantic Co. (C. C.) 104 Fed. 887; Greene v. Buckley (C. C.) 120 Fed. 955; Boston Woven Hose Co. v. Star Rubber Co. (C. C.) 40 Fed. 167; Hutter v. De Q. Bottle Stopper Co., 128 Fed. 283, 62 C. C. A. 652; Glucose Sugar Refining Co. v. St. Louis Syrup Co., supra.

Upon the accounting it was further shown that in 1892, when the business began, the defendants were joint owners of 40 per cent. of the capital stock of the company, which was gradually increased until the year 1900, when they owned 66 per cent. The record shows that dividends amounting to 10 per cent. were declared annually from 1892 to 1900, and that the defendants were each paid a salary amounting to $6,000 per annum, which later was increased to $7,500 per annum. In 1892 the capital stock of the company was $287,000; in 1893. $342,-

000; in 1897, $389,000. The witness Eisner testifies that the assets of the company on January 6, 1900, amounted to $320,597.19; the total liabilities being $188,363.51, leaving a surplus of $130,000 which was used to increase the capital stock to $750,000. Prior to increasing the same a dividend of 31 per cent. was declared by the defendants and another director. On December 31, 1900, following the decision of the Supreme Court, the defendant Eisner was authorized by a resolution to exchange 47 bonds owned by the company, and secured by a general mortgage of a corporation known as the "Johann Hoff Company," for 2,500 shares of the capital stock of the latter company. The lease of the Hunyadi Matyas spring was assigned to secure a further loan of $7,000. The company assumed an individual indebtedness of the defendants, amounting to $2,650, and also, at the request of Eisner, acting as its president, assumed a contract entered into by himself, Mendelson, and others to purchase 51 additional bonds of the Johann Hoff Company. The defendants and one Bleier, a director of the company, bought outstanding stock, using the company's money in payment; i. e., by debiting their respective accounts with one-third of the total amount of the purchase, and crediting such account with the dividend of 31 per cent., as above mentioned. Later, on April 30, 1902, pending the accounting, the remainder of the assets was assigned and transferred to a new corporation, the Eisner & Mendelson Company of New York. Such were the methods adopted by Eisner and Mendelson as individuals, who, as has been said, controlled the company in all its undertakings, to prevent the collection and payment of the said judgment for damages and profits awarded to the complainant. From the foregoing it will readily be perceived, I think, that such acts were not simply those of officers interested in the legitimate direction of the affairs of the corporation. The facts indisputably indicate an intentional participation by the defendants in the fraudulent and wrongful acts complained of, and that the advantage thus derived inured principally to their individual benefit.

As a result of the consideration of the authorities and the evidence in its entirety, I am of the opinion that complainant is entitled to the relief demanded in the bill, with costs.