HARRINGTON et al. v. ATLANTIC & PACIFIC TELEGRAPH CO. et al.

(Circuit Court, S. D. New York. January 25, 1906.)

1. COURTS—JURISDICTION OF FEDERAL COURTS—SUIT ARISING UNDER PATENT LAWS.

Where a suit involves the question of infringement of patents, it is one arising under the patent laws and within the jurisdiction of a Circuit Court of the United States by virtue of Rev. St. § 629, cl. 9 [U. S. Comp. St. 1901, p. 504], although it also involves the question of the ownership of the patents or other contract rights.

[Ed. Note.—For cases in point, see vol. 13, Cent. Dig. Courts, § 832. Jurisdiction of federal courts of suits relating to patents, see note to Bailey v. Mosher, 11 C. C. A. 313.]

2. TRUSTS—ESTABLISHMENT AND ENFORCEMENT—FOLLOWING TRUST PROPERTY.

To carry out an agreement between complainants, who were owners of certain patents, and the controlling stockholder in defendant corporation, acting in its behalf for the transfer of the patents to the corporation in exchange for a stated amount of its stock, an absolute assignment of the patents was made to such stockholder, but accompanied by written directions that they should not be conveyed to the corporation until it delivered to him the stock, and also directions for the distribution of the stock by him between complainants and others, for whom they were trustees. He assented to the arrangement, but thereafter conveyed the patents to the corporation, ignoring the conditions, which were never performed. Held, that he took and held the title to the patents as trustee only; that his assignment to the corporation in violation of the trust, of which the corporation had knowledge, was ineffective to convey the title or to protect it from a suit for infringement because of its use of the patented devices; and that such a suit was one arising under the patent laws, within the meaning of Rev. St. § 629, cl. 9 [U. S. Comp. 1901, p. 504], of which a federal Circuit Court was thereby given jurisdiction, although it incidentally sought other relief by compelling a reconveyance of the patents.

3. PATENTS—INFRINGEMENT BY CORPORATION—LIABILITY OF STOCKHOLDER.

The owner of the majority of the stock of a corporation, who controlled its affairs and who transferred to it certain patents in violation of a trust under which they had been conveyed to him by the owners, is equally liable with the corporation for its infringement of the patents by the use of the patented devices.

In Equity.

Butler, Stillman & Hubbard (John Notman, of counsel), for complainants.

Dillon & Swayne and Rush Taggart, for defendants.

HAZEL, District Judge. This action was brought to restrain infringement by the Atlantic & Pacific Telegraph Company (herein called the "Company") and Jay Gould in his lifetime of a large number of United States letters patent granted to George Harrington, assignor, and Thomas A. Edison, inventor, and for an accounting and damages, together with such other relief as the complainants may equitably be entitled to receive. The bill was filed in this court in May, 1876, nearly 30 years ago. In December, 1892, Jay Gould died, and on or about the 20th of December, 1895, on the application of the complainant Edison, this suit was revived as against his executors and

trustees under his last will and testament. Pending this bill, and on or about the 5th day of December, 1892, George Harrington, one of the original complainants, died, and on March 10, 1895, Josiah C. Reiff, by order of the court, was made a party complainant in his stead. The complainants claim that the principal purpose of the bill is to establish the liability of the company as an infringer of said patents, and also to determine the liability of the testamentary executors and trustees of Jay Gould, who in his lifetime, it is claimed, actively participated in the alleged infringing acts and inspired the same. Although the case has been pending undetermined many years, it cannot truthfully be asserted that the patience, courage, and anticipation of the litigants have been exhausted or the final settlement deferred because of objectionable rules of procedure or any tardiness of justice. As stated, parties to the suit have died and others have intervened, yet whatever delay or procrastination may be presumed is not attributable to any causes other than such as were created and suffered by the mutual acts of the parties themselves.

At the threshold of the case the court is confronted by the question of lack of jurisdiction; it being contended by the defendants that this is not a case arising under the ninth clause of section 629 of the Revised Statutes of the United States [U. S. Comp. St. 1901, p. 504]. This section in plain terms confers original jurisdiction upon the Circuit Courts of the United States "of all suits at law or in equity arising under the patent or copyright laws of the United States." Concededly, the requisite diversity of citizenship does not exist herein, the original complainant Harrington having been a citizen of the District of Columbia; and accordingly the point that requires discussion is whether this action is one arising under the patent right laws, or whether the bill simply involves contractual rights in relation to the patents in question. The joint and separate answers of the defendants raise no issue regarding the validity of the patents. It is, however, contended that the principal question to be decided arises out of the contracts hereinafter mentioned, and that the rights under the patents are merely incidental to the relief demanded in the complaint; such relief being in the nature of a demand to set aside the title because of the fraud of the defendants. To solve the problems presented it is necessary to preface the material facts; for, even though contract rights are involved, if the question of infringement of patents is also presented, the court is not deprived of jurisdiction. This principle was enunciated in Littlefield v. Perry, 88 U. S. 205, 22 L. Ed. 577, Excelsior Wooden Pipe Co. v. Pacific Bridge Co., 185 U. S. 282, 22 Sup. Ct. 681, 46 L. Ed. 910, and Atherton Machine Co. v. Atwood-Morrison Co., 102 Fed. 949, 43 C. C. A. 72.

The complainant Edison was the original inventor of an apparatus and improvement relating to the rapid transmission of communication by telegraph. Such devices and improvements specifically relate to recording and copying messages, chemically preparing paper and perforators for a new and novel method or system of automatic telegraphy, and a so-called duplex and quadruplex telegraphy. Ac-

cording to a written instrument in evidence Edison assigned a two-third interest in such patents and inventions to Harrington, the original complainant, retaining a one-third interest. Under the terms of the written arrangement, Harrington exclusively controlled the inventions and had power and authority to dispose of them whenever he deemed it advisable to do so. And he was empowered to assign the respective interests in such patents and inventions owned either by Mr. Edison or himself and such other owners as became associated with them in projecting and developing the same. Sales or transfers of the property rights mentioned under the agreement were to inure to the benefit of the owners. The bill alleges that 39 different patents were granted by the Commissioner of Patents to secure to the patentee the monopoly of the inventions and improvements for automatic telegraphy. The earlier patent, No. 121,601, was dated December 5, 1871, and the latest, No. 171,273, was granted December 21, 1875. The numbers of the various patents, together with the date of each and a titular statement of the particular character of the improvements, are set forth in the complaint.

It is alleged, inter alia, that the defendant company is infringing the various patents for said system of automatic telegraphy, and that in its behalf it is falsely claimed to have the right to use such system, together with a telegraph line between New York and Washington, owned by the Automatic Telegraph Company. The oral and documentary evidence found in the record abundantly shows that, though the titles to the patent in suit were in Harrington, certain other individuals named in the bill were associated with him to exploit and install the said automatic system of telegraphy. Indeed, the court is convinced that, on account of financial assistance received from such associates, they were entitled under the agreement to participate in the profits of the enterprise in proportion to the amount contributed by them; in fact, Mr. Harrington was trustee for his said associates conjunctively with himself, and as such held title to the patents. At the time of the transfer to Mr. Gould, as hereafter stated, Harrington was president of the Automatic Telegraph Company and with his associates managed and controlled said company. Under a contract of purchase from a company known as the National Telegraph Company, the Automatic Telegraph Company had the right to use, and at that time did use, the telegraph line of the latter from New York to Washington. In the conduct of its business the Edison patents in suit and also the patents of one Little, comprising the automatic system of telegraphy, were used. In this situation the complainant Reiff in the month of December, 1874, negotiated with Jay Gould, apparently at the latter's solicitation, for the sale and transfer to him of the automatic telegraph system, with the telegraph line and apparatus, officers, etc., above mentioned, including any similar patents that Mr. Edison might thereafter invent. The proofs show that Gould had actual knowledge of the existing arrangements between Harrington and Edison and their associates, and that they were jointly interested in promoting the contemplated installation of a new and rapid method of telegraphy. He was fully

informed on the subject. In explanation of his desire that the company should acquire the ownership of the line and property of the Automatic Telegraph Company and the patents covering its system, it is claimed that, as the owner of a majority of the capital stock of the former, he intended to inaugurate a departure in telegraphy so as to better enable competiton with the Western Union Telegraph Company. During the progress of the negotiations between Reiff and Gould, the latter declared that he represented the company, while the former stated that he represented Mr. Harrington. Additional negotiations quickly following resulted in a memorandum, dated December 30, 1874, expressing the understanding of the parties; and, whatever were the ultimate relations, the said memorandum concededly became the basis for subsequent negotiations between Harrington on the one side and Gould on the other. The memorandum is in these words:

"578 Fifth Avenue, N. Y., Dec. 30th, 1874.

"It is hereby understood that the undersigned will heartily co-operate in concluding an alliance between the A. & P. Telegraph Co. and the Automatic System on the general basis following:

"A. & P. to increase her capital to $15,000,000.

"Automatic interest to receive $4,000,000.

"To remain in treasury, $1,000,000.

"Total, $5,000,000.

"The 14,000 shares A. & P. now in the Co.'s treasury to be distributed to the A. &. P. stockholders as a dividend.

"Automatic System covering patents, contracts, etc., to be turned over to A. & P. Co.

"Management to be mutual and subject to approval of Mr. Jay Gould and Col. Thos. A. Scott.

"Gen. T. T. Eckert to be president.

"T. A. Edison to be electrician.

"D. H. Craig to organize the news department.

"The Automatic are to conclude the pending contracts with Erie, Penna. R. R., and B. & O. and turn them over to A. & P.

"The A. & P. Tel. Co. to assume the liabilities under said contracts.

"Automatic to have representation on executive committee.

"[Signed]                    Josiah C. Reiff.
                              "Jay Gould.
                              "John McManus."

Another paper was signed at this time. It reads as follows:

"N. Y., Decr. 30, '74.

"It is understood that in the negotiation between the undersigned, Jay Gould is to receive 1–10th of results to McManus & party, & to receive 1–10th of results of future interests at home & abroad.

                              "Josiah C. Reiff.
                              "Jay Gould.
                              "John McManus."

As indicative of the intention of Gould to reorganize the company, and to abandon the use of the Morse system of telegraphy, and to adopt the automatic system, the testimony shows that on the evening of December 30, 1874, after the memorandum was made, Gould exhibited it to Gen. Eckert while en route to interview Edison in relation to the proposed plan and for the purpose of purchasing his interest in the duplex and quadruplex patents. Subsequently a

reorganization of the company was effected; the witness Eckert, an erstwhile officer of the Western Union Telegraph Company, becoming its president. The above negotiations were not only afterwards approved by Harrington, but thereafter he transferred the automatic system, including the duplex and quadruplex patents, and the rights of the Automatic Telegraph Company, conditionally to Gould. The deeds and transfers are dated January 1, March 9, and April 9, 1875, respectively.

The crucial question, decisive of the jurisdiction of this court, is whether such transfers and assignments were absolute conveyances of the patents and property rights therein specified, or whether, with the knowledge of the Atlantic & Pacific Telegraph Company, they were dependent upon certain assignments or an allotment of shares of stock of the last-mentioned company. This phase of the controversy requires careful consideration of the facts. The Harrington assignment, dated the 9th of April, 1875 (approved April 15, 1875), expressing a nominal consideration, specifies the various patents and in terms absolutely conveys the entire Harrington interest. It is shown, however, that with the deeds a separate written instrument was delivered. Such document is in these words:

"New York, April 16, 1875.

"Sir: I hand you herewith a specific assignment of each and every patent and application for patents, covering all of T. A. Edison's inventions for automatic telegraphy, and whereby the full and complete title invests.

"The consideration to be paid therefor is thirty-one thousand eight hundred shares of the stock of the Atlantic & Pacific Telegraph Company.

"I will thank you to withhold the within assignment until the Atlantic & Pacific Telegraph Company shall deliver to you the said shares of their stock, when the assignment will be delivered to them.

"These shares you please hold subject to delivery to the following named parties:

| | |
|---|---|
| John McManus, Reading, Pa. | 43 shares |
| Seyfert, McManus & Co., Phila. | 4,698 " |
| Wm. H. Seyfert, Phila. | 320 " |
| Wm. J. Palmer, Colorado. | 540 " |
| John Elliott, Riggs & Co., N. Y. | 200 " |
| H. C. Dallett, Jr., Phila. | 60 " |
| E. Corning, Albany | 80 " |
| James Dallett, Trustee, Phila. | 120 " |
| Alex. Morten, N. Y., 80 Broadway | 40 " |
| J. J. Marsh, Haverhill, Mass. | 60 " |
| Sam'l B. Parsons, Flushing | 500 " |
| J. C. Reiff, New York | 7,057 " |
| A. & P. Telegraph Co. | 1,400 " |
| T. A. Edison | 3,000 " |
| J. C. Reiff, Sec'y. | 1,428 " |
| Geo. Harrington | 12,254 " |
| | 31,800 |

"The receipts of said parties shall be your full acquittance.

"Very respectfully,                                    Geo. Harrington.

"Jay Gould, Esq.:

"Of the above sums there is the amount of $40,000 (about) currency, or about 1,600 shares (a little less) to be deducted from the account of J. C. Reiff, and redistributed to J. C. Reiff, Geo. Harrington, S. B. Parsons, Wm.

J. Palmer, Edison and McManus. This redistribution, as it shall be agreed to, will be handed to you in the form of a paper signed by Reiff, Parsons, and Palmer, and should be approved by Edison.

"With such paper please deduct and add to respectively as that paper will show."

The approval of Edison also accompanies the above letter, and reads as follows:

"New York, April 16, '75.

"I, Thomas A. Edison, owner of one-third of my several inventions for automatic telegraphy, sold with my consent and approval to Mr. Jay Gould, do hereby make an allowance to Geo. Harrington and J. C. Reiff, from my one-third share of the proceeds obtained for said patents, for their time, trouble, and services in connection with said inventions, and authorize such further deductions from my share as with the two-thirds controlled by Mr. Harrington, shall be required to reimburse the several parties by whom money may have been advanced for automatic purposes, upon the basis of four in A. & P. stock to one of cash; that is to say, in the several amounts as herein set forth.

"Thos. A. Edison."

This writing, considered in connection with the evidence, in my opinion, constituted Gould a mere trustee. It carried with it no power or authority to assign the patents and rights in the deeds mentioned to the company, unless the imposed conditions were either waived or performed. Later, on April 10, 1875, the Automatic Telegraph Company approved the assignment to Gould and authorized a transfer of its rights in the automatic telegraph system. Such conveyance was also accompanied by a writing in effect directing that delivery of the assignments be withheld until the titles were perfected and certain shares of the capital stock paid to the National Telegraph Company and to certain individuals whose names appear in the writing.

Complainants contend, as already indicated, that a trust relationship was established by virtue of the assignments to Gould for the beneficiaries named in the memorandum accompanying the deeds. That it was the intention of the persons directly concerned to continue Gould successor to Harrington as trustee is fairly established by the elicited facts and circumstances. The weight of the evidence in its entirety favors this view, and shows that the conveyances of the automatic system to Gould were as to an intermediary to hold the title until the imposed conditions were performed. The proofs are singularly clear and convincing that Gould understood the purpose of the conveyances to him. The uncontradicted testimony shows that on April 8, 1875, a committee representing the interests of the complainants called upon Gould and declared their willingness to leave the matter of the disposal of the automatic telegraph system to him, believing that he would be able to secure the fulfillment of their desire to sell out their interests to the company. In reply, Gould is claimed to have assented and indicated, in effect, that the interested parties could look to him to see to it that the sale would be perfected and the conditions performed. Indeed, Harrington and Reiff testified that Gould remarked in substance that he would accept the trust and see that it was carried out. This testimony, in con-

nection with the delivery of the deeds, accompanied by specific instructions to withhold the assignment until the company delivered the shares of stock, warrants the conclusion that the trust was accepted. On July 19, 1875, Gould transferred to the defendant corporation the patent rights, including the quadruplex patents, for a nominal consideration. The conditions upon which the deeds were delivered to him were ignored and have not been performed. To advert in detail to all the testimony which requires me to hold that the company accepted the assignment with full knowledge of the rights of complainants and their associates is not necessary. The initiatory memorandum of the negotiators tersely states that the Automatic interests were to receive $4,000,000 of stock of the increased capital of the company. Although Eckert denies seeing the memorandum, in my opinion, the evidence preponderates to the contrary. That Gould, though not a trustee of the defendant corporation, controlled its affairs, is not seriously controverted. Furthermore, Eckert on January 24, 1875, took charge of the affairs of the company, and soon afterwards he took possession of the Automatic Telegraph Company, its offices and properties, and the company advanced money to pay its debts. Thereafter he continued negotiations with the railroad companies mentioned in the memorandum for the completion of contracts to extend the lines and increase the facilities of the automatic system, and the capital stock of the company was increased.

It is urged that complainants violated the understanding by omitting to conclude the pending negotiations; but the evidence on this point indicates that prior to the transfer Eckert waived such stipulation and at his suggestion the complainants discontinued such pending negotiations. The complainants were relieved by the acts of Eckert from further responsibility. The proofs show that Harrington received from Gould the sum of $113,000 in full of his interest in the patents and properties in suit. The testimony upon this point is direct and unequivocal; Harrington testifying that on account of the condition of his health he planned a trip to Europe, and therefore suggested that Gould purchase his individual interests. This suggestion, or offer of sale, was subsequently accepted. The interest of one Parsons, amounting to $12,500, was also purchased by Gould, so say nothing of additional amounts paid or advanced by him to others on account of his bargain. The amounts of money paid by him were subsequently repaid by the company. The purchase of the Harrington and Parsons interests, in view of the evident intention to keep the said patents and the system as an entirety, does not, in my judgment, because of the trust relations, operate to conclude the cestuis que trust from now claiming that such patents were infringed. The company operated the automatic system of telegraphy until 1877, when it was abandoned. In August, 1875, and May, 1876, notice was given by complainants to Gould and the company to discontinue its use and to reconvey the same to Harrington and Edison. This, however, was not done.

The defendants contend that the company merely had an option to buy the automatic system on the terms contained in the memoran-

dum; that possession was simply for the purpose of experimentation, and not pursuant to any other understanding or intention. But the negotiations between the parties and their subsequent acts do not indicate any presumption of that character. The allegations of the bill, perhaps, in a general way indicate an option as a result of the suggested alliance between the companies, but the evidence irrefutably shows an intention to carry out the arrangement and sale in accordance with the writing delivered simultaneously with the deeds. The accompanying conditions and stipulations must equitably be given the effect of retaining to the complainants their equity in the patent rights which are the subject of this controversy. Nor did the payments to Harrington, Edison, and Parsons for their interests, giving consideration to the evidential facts, operate as an absolute conveyance to Gould. It is a plain principle that a court of equity will look beyond the terms of the deed to the real intendment of the parties. In Peugh v. David, 96 U. S. 332–336, 28 L. Ed. 127, the Supreme Court says:

"As the equity, upon which the court acts in such cases, arises from the real character of the transaction, any evidence, written or oral, tending to show this is admissible * * * The rule does not forbid an inquiry into the object of the parties in executing and receiving the instrument. Thus it may be shown that a deed was made to defraud creditors, or to give a preference, or to secure a loan, or for any other object not apparent on its face. The object of parties in such cases will be considered by a court of equity. It constitutes a ground for the exercise of its jurisdiction, which will always be asserted to prevent fraud or oppression, and to promote justice."

See, also, Horn v. Keteltas, 46 N. Y. 605; Barry v. Hamburg-Bremen Fire Ins. Co., 110 N. Y. 1, 17 N. E. 405.

Having stated the essential facts and my conclusions thereon, I come again to the principal objection insisted on by counsel for the defendants. As already stated, the question of jurisdiction depends upon whether this suit arises under the patent laws or whether the issues merely involve the violation of contractual obligations. In the view I take of this controversy, the adjudications cited by defendants to sustain this point are of doubtful application. The cases to which attention is directed were chiefly concerned with contract rights. See Wilson v. Sandford, 10 How. 99, 13 L. Ed. 344; Hartell v. Tilghman, 99 U. S. 547, 25 L. Ed. 357; Albright v. Teas, 106 U. S. 613, 1 Sup. Ct. 550, 27 L. Ed. 295. And in White v. Rankin, 144 U. S. 629, 12 Sup. Ct. 768, 36 L. Ed. 569, the distinction between such cases and those wherein the infringement is of the essence of the bill is clearly pointed out. That the defendant corporation operated the automatic system and the properties in question under a subsisting contract is not claimed by complainants. The gravamen of the bill is based, apparently, upon the wrongful and fraudulent appropriation by the defendants of their patents. True, the prayer for relief, among other things, embodies a request that the defendants be decreed to reconvey to complainants their title; but this request for relief is collateral to the primary relief demanded. Atherton Machine Co. v. Atwood-Morrison Co., supra; Littlefield v. Perry, supra; Ex-

celsior Wooden Pipe Co. v. Pacific Bridge Co., supra. If in this case the bill stated a subsisting contract, which in equity could be set aside because of fraud or other sufficient causes, a different question would be presented. The proposition that the bill cannot be maintained against the defendant Gould, because the allegation of infringement is principally directed against the defendant company, is without merit. The facts amply show, not only a trust relationship between Gould and the equitable owners of the patents, but also that the former participated and profited in the infringing acts. In short, he instigated the tort or trespass and effectuated a wrongful appropriation of complainants' patents. He invaded rights which the laws were designed to protect. He controlled the transactions of the company and was a principal in the wrongdoing, and hence his representatives cannot now be heard to disclaim responsibility from the consequences of the acts which are the subject of the complaint. National Car Brake Shoe Co. v. Terre Haute Car & Mfg. Co. (C. C.) 19 Fed. 514; Peters v. Union Biscuit Co. (C. C.) 120 Fed. 679; Lovejoy v. Murray, 3 Wall. 1, 18 L. Ed. 129; Tootle v. Coleman, 107 Fed. 41, 46 C. C. A. 132, 57 L. R. A. 120; Saxlehner v. Eisner, 140 Fed. 938.

There was some discussion at the hearing and in the briefs submitted about the ownership of the duplex and quadruplex inventions; they not being specifically mentioned in the memorandum. Notwithstanding the deed from Edison to Gould conveying these inventions, I think that the evidence establishes that such patents were included in the general arrangement by which the patents relating to the automatic system were held, and that was the understanding of the parties. This view finds corroboration in the deed of January 1, 1875, from Harrington to Gould, covering these patents. My conclusion, after careful consideration of the law and facts, is that the assignments in question to Gould and from him to the company are inoperative; that this case arises under the patent laws, and hence is properly brought in this court. Such being the interpretation of the bill and my conclusion upon the facts, infringement is not controverted.

The patents having expired, a decree may be entered for an accounting with costs. So ordered.