AMERICAN BANK PROTECTION CO. v. ELECTRIC PROTECTION CO. et al.

(Circuit Court, D. Minnesota, Fourth Division. January 3, 1910.)

No. 851.

1. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—DROP FOR ELECTRIC CIRCUITS.

The Robins patent, No. 850,101, for a drop for electric circuits, covers a new automatic plunger drop which was not anticipated, discloses patentable invention, and is not shown by the evidence to be invalid on the ground of prior public use for more than two years before the application therefore was filed. Also *held* infringed.

2. PATENTS (§ 81*)—PRIOR PUBLIC USE—EVIDENCE.

The defendant in an infringement suit who attempts to defeat the patent by evidence of prior public use not only has the burden of proof, but

must establish the fact by clear and satisfactory evidence beyond a reasonable doubt.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 104; Dec. Dig. § 81.*

Priority and continuance of public use of invention as affecting patentability, see note to Eastman v. City of New York, 69 C. C. A. 646.]

**3.** PATENTS (§ 328*)—INFRINGEMENT—VAULT LINING.

The Grass patent, No. 880,020, for a vault lining for use in connection with an electrical alarm circuit, construed, and *held* not infringed.

**4.** PATENTS (§ 328*)—INFRINGEMENT—ELECTRIC TIME ALARM.

The Robins and Jacoby patent, No. 771,748, for an electric time alarm consisting of a combination with a time mechanism of an electric alarm circuit connected therewith, *held* not infringed by a device using an entirely different mechanism in its circuit closer and its arrangement with respect to the mechanism of the clock by which it is actuated.

**5.** PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—BURGLAR ALARM.

The Robins and Jacoby patent, No. 771,749, for a burglar alarm, claims 3 and 6, for a combination of a time circuit closer and door bolt circuit closer and a gong circuit, are void for lack of invention, and the circuit-closing device shown in other claims must be limited to that described or its mechanical equivalent. As so construed, *held* not infringed.

**6.** PATENTS (§ 327*)—DECISIONS—PREVIOUS DECISIONS AS CONTROLLING—PREVIOUS ADJUDICATION OF VALIDITY OF PATENT.

A decision of a Circuit Court sustaining the validity of a patent should be followed by another Circuit Court if the evidence in both cases is substantially the same.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 622; Dec. Dig. § 327.*]

**7.** PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—BURGLAR ALARM.

The Robinson and Green patent, No. 708,496, for a burglar alarm, *held* not anticipated, valid, and infringed as to claims 1, 2, 3, 7, 8, and 10, but not infringed as to claims 9, 11, 12, and 13.

**8.** PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—ELECTRIC BURGLAR ALARM.

The Coleman reissue patent, No. 11,626 (original No. 570,906), for an electric burglar alarm, claims 6 and 21, are void for lack of invention in view of the prior art. Claims 18 and 20 are for a combination which was not anticipated and disclose invention and are entitled to a fairly broad construction. As so construed, *held* infringed.

**9.** PATENTS (§ 138*)—REISSUES—VALIDITY.

A reissue patent cannot be defeated by a patent to another issued before the reissue, but after the original patent on which it is based.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 202; Dec. Dig. § 138.*]

**10.** PATENTS (§ 328*)—INFRINGEMENT—ELECTRICAL BURGLAR ALARM.

The Coleman patent, No. 626,670, for an electrical burglar alarm, in view of the prior art, must be limited to the specific mechanism therein described or its mechanical equivalent. As so limited, *held* not infringed.

**11.** PATENTS (§ 328*)—INFRINGEMENT—ELECTRICAL BURGLAR ALARM SYSTEM.

The Coleman patent, No. 627,054, for an electrical burglar alarm system, claim 17, limited as it must be to the means set forth in the patent for testing the alarm mechanism, or their equivalent, *held* not infringed.

**12.** PATENTS (§ 328*)—INFRINGEMENT—ELECTRICAL BURGLAR ALARM SYSTEM.

The Coleman patent, No. 632,513, for an electrical burglar alarm system, construed, and *held* not infringed.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

13. PATENTS (§ 328*)—INFRINGEMENT—BURGLAR ALARM SYSTEM.
The Coleman patent, No. 667,115, for a burglar alarm system, claims 12, 13, 14, and 15, limited to the devices described, were not anticipated and are valid. Also *held* infringed.

14. PATENTS (§ 287*)—LIABILITY FOR INFRINGEMENT—OFFICERS OF CORPORATION.
Directors of a corporation cannot be held individually liable for infringement of a patent by the corporation merely because they signed a paper agreeing to save harmless from infringement suits purchasers who had previously bought the infringing devices.
[Ed. Note.—For other cases, see Patents, Cent. Dig. § 459; Dec. Dig. § 287.*]

15. PATENTS (§ 325*)—SUIT FOR INFRINGEMENT—COSTS.
A complainant in an infringement suit who recovers only on a part of the claims of a patent sued on is not entitled to recover costs as to such patent.
[Ed. Note.—For other cases, see Patents, Cent. Dig. § 607; Dec. Dig. § 325.*]

In Equity. Suit by the American Bank Protection Company against the Electric Protection Company, Alvin Robertson, H. N. Stabeck, W. E. Jones, George E. Towle, W. A. Laidlaw, C. H. Baldwin, and Charles Carothers. On final hearing. Decree for complainant.

Paul & Paul, for complainant.
John E. Stryker, for defendants.

WILLARD, District Judge. This case involves an alleged infringement of certain patents, to wit: C. Coleman, No. 11,626, August 17, 1897; C. Coleman, No. 626,670, June 13, 1899; C. Coleman, No. 627,054, June 13, 1899; C. Coleman, No. 632, 513, September 5, 1899; C. Coleman, No. 667,115, January 29, 1901; F. C. Robinson and J. E. Green, No. 708,496, September 2, 1902; W. H. Robins and J. F. Jacoby, No. 771,748, September 2, 1902; W. H. Robins and J. F. Jacoby, No. 771,749, October 4, 1904; W. H. Robins, No. 850,101, April 9, 1907; J. L. Grass, No. 880,020, February 25, 1908. The bill of complaint alleges infringement of 12 patents. At the time of taking complainant's testimony in chief, counsel for complainant gave notice of withdrawal of two of the patents, and the record has been made on the other 10 patents, above named.

### Robins Patent, No. 850,101.

As to this patent the complainant says in his brief:

"The novelty in this drop of patent No. 850,101 consists in combining with the drop plate, or 'drop,' as it is called in the claims of the patent, a spring-pressed pin which is normally in the local circuit and in contact with the drop."

The defendants in their brief say:

"The alleged invention consists in substituting for the flat spring of Robinson and Green or other old patents a coiled spring surrounding a follower pin, actuated in the same way and performing the same functions as the flat spring. This is a case of equivalents where the substituted element performs the same function in substantially the old way and by substantially the old means."

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

That this new drop with the coiled spring and the follower pin does not perform the same function in substantially the same way and by substantially the same means as the drops formerly used by the complainant or other persons is apparent from the testimony of defendants' own witness Jacoby. He said, in stating the difficulties with the former drops:

"The drop is really, as it were, the heart of the system. It was very important to have a good article, something that would work without fail at the critical moment, and in attempting to better it I produced a different arrangement of these contacts. * * * But this platinum contact on the upper spring and on the shutter was put on there by solder, and the break was not very sudden, because of the angle of incline of this contact surface, and the arc that was formed at the time of this break in testing the system, or the alarm, would melt the solder and cause it to flow over the top of the platinum and cause the platinum to roughen, and the shutter would often stick up and not fall as it was intended to, being pressed down wholly by gravity; and this caused a great deal of annoyance to our company from the patrons, caused us a great deal of expense to send experts out to fix it, and it didn't keep fixed. It didn't stay fixed."

As to the object of the new device he said:

"The whole object was to have something to support this plunger which would give a direct pressure upon this shutter—a downward pressure upon the shutter, instead of a sliding pressure. The object of the plunger was so that we might have something to increase the speed of the falling of the shutter by this spring pressure, but to have a limited motion to the plunger so that the break might be both sudden and of sufficient space to prevent arcing of this gap. This direct motion of the plunger also avoided all the friction of the sliding contact on this drop. Defendants' Exhibit, Complainant's Drop No. 2."

The complainant's witness Robins, speaking of the objections to the old drops and what was accomplished by the new drops, said:

"Since we first started we had considerable trouble at times with our drops. The old original drop, D–8, we found had too short a break, and very often it was the case it would arc and burn off the contact. To overcome that this drop, D–9, was the next one out. That one was intended to eliminate those other troubles by making a longer break; but in this drop frequently it would burn, and the contact points would get rough so that the shutter would stay up instead of dropping when the armature came back. And in order to overcome all these troubles I invented this drop, D–7.

"Q. 48. Now what is the difference between that drop D–7 and the preceding drops you have referred to there, D–9 and D–10, and in what way does it overcome the objections?

"A. This drop D–7, which has the plunger point contact, overcomes several of those other troubles. One of the main parts is that it does not stick. The shutter always falls when there is a contact. The spring throwing the plunger helps force down the shutter, which makes a better contact with the ringing circuit. The break is quicker, and eliminates a great deal of trouble of arcing."

The new plunger drop was in every way a success. This is indicated by the fact that the defendants adopted it in its entirety without any change whatever, and are now using it.

This device, to my mind, indicates something more than mechanical skill, and involves invention. Thomson v. Citizens' National Bank of Fargo, 3 C. C. A. 518, 53 Fed. 250; Krementz v. S. Cottle Co., 148 U. S. 558, 13 Sup. Ct. 719, 37 L. Ed. 558.

181 F.—23

It is true that the spiral spring had been used before. It appears in the patent to Wood, No. 383,933, of June 5, 1888; but it had never been used in the combination with an automatic drop, as it now appears in the patent in suit. Western Electric Co. v. La Rue, 139 U. S. 601, 11 Sup. Ct. 670, 35 L. Ed. 294; Potts v. Creager, 155 U. S. 597, 15 Sup. Ct. 194, 39 L. Ed. 275; Du Bois v. Kirk, 158 U. S. 58, 15 Sup. Ct. 729, 39 L. Ed. 895; American Tobacco Co. v. Streat, 83 Fed. 700, 28 C. C. A. 18.

In my opinion the patent is valid, and the complainant is entitled to a decree as prayed for in its bill, unless the defense now to be considered can be maintained.

It is claimed by the defendants that this patent is void because the drop was in public use and on sale by complainant for more than two years before the date of the application for the patent. This date is December 6, 1905. The use relied upon must have existed, then, prior to December 6, 1903. By far the most satisfactory evidence in the case upon this point is the testimony of E. Ward Wilkins, a witness for the complainant, who was at the time he testified, and for some years prior thereto had been, the secretary and manager of Patrick, Carter & Wilkins Company of Philadelphia. It was from this company that the complainant, while Jacoby was with it, had bought drops from time to time. Wilkins testified, basing his evidence upon correspondence between his company and the complainant, which he produced, that the first order which his company received from the complainant for the plunger drop was on the 23d of September, 1903. The complainant sent to his company at that time a sample drop and specifications, and asked for a price on 350 of them. A price was made at a dollar for each one, which offer was accepted by the Philadelphia Company, and it agreed to ship them before January 1st. One hundred and fifty of the drops were shipped on the 24th of December, 1903, from Philadelphia, and the 200 others on the 30th of December of the same year. I consider, therefore, that it is conclusively established that none of the drops now in use were bought by complainant to be placed in its system until September, and that none were actually received and used by it from other parties prior to January 1, 1904.

It is claimed, however, by the defendants, that other kinds of drops which had been used in the complainant's factory were remodeled and made into the plunger variety, and that this was done in the early part of the year 1903; such remodeled drops having been placed in the systems which were then put out. The principal witness to support this contention of the defendants is Jacoby. He testifies repeatedly that this plunger drop was used in the early part of 1903, and yet it is apparent from his own testimony that he has no definite recollection of the time, and no accurate knowledge as to the date when the first one was used. He said, for example:

"It was actually cold weather, we had heat in the building, and it was closed up at the factory at the time that Mr. Robins made the first plungers for us. I don't know how near the center of winter it was. Might have been the fall before. I am not real certain about that. I never tried to fix that in my mind in any way."

Robins himself, who was a witness for the complainant, testified:

"I know it was in hot weather, for we had the windows up at the time that this first drop was invented; but I know a few days after that it was practically cool weather, because the windows was all down, especially the time we was testing these drops, etc. It was not a hot day. That I judge from my recollection of the time of year."

Robins says, however, that, instead of being the fall of 1902, this took place in the fall of 1903.

That Jacoby is mistaken when he testified that the plunger drop was first made and used in the early part of 1903 is almost conclusively established by other testimony given by Wilkins, the witness above mentioned. When he gave his testimony, it had already appeared from the evidence of Jacoby, Robins, and others that there were at least three, and according to one witness four, kinds of these drops made and used by the complainant between 1902 and 1904. Jacoby himself mentions three, the last of which, numbered 3, is the plunger drop, and the one now in use. That numbered 2, according to the testimony not only of Jacoby but of Robins, was entirely designed by Jacoby and was his invention. Wilkins produced a letter from the complainant company, dated May 21, 1903, placing with his company an order for 300 drops to be delivered within 60 days. These drops were of substantially the kind described and identified by Jacoby as drop No. 2, and were not the plunger drop No. 3. This order was filled by Wilkins' Company in July and August, 1903.

That the plunger drop was greatly superior to drop No. 2 was proven by the testimony of Jacoby himself as well as by that of other witnesses. It is therefore impossible to believe that if Jacoby really invented the plunger drop in the early part of 1903, and, as he testified, placed one of them in the set of trunks prepared for Donaldson in March of that year, he should two months afterwards have placed an order for 300 of the No. 2 drops, which, according to his theory, had been entirely superseded by drop No. 3. This evidence itself is sufficient to show that Jacoby is entirely mistaken when he claims that the present plunger drop was in use prior to July 7, 1903.

It is claimed, however, by the defendants, that their case does not rest upon the oral testimony of Jacoby, but that he produced documents fixing the date beyond any question, and placing it prior to July 7, 1903. This document produced by Jacoby consisted of a notebook, in which he testified that he had made, under date of July 7, 1903, memoranda relating to various matters which he then or immediately thereafter discussed with McClintock the manager of the company. He says that the purpose of this discussion with defendant was to satisfy him what the improvements were that Jacoby had suggested in regard to the business of the complainant, and that they were valuable, and the specific item in this memoranda upon which reliance is placed is the following:

"Patent the improvements in auto D."

It is claimed by Jacoby that this was to remind McClintock to apply for a patent on the plunger drop now in use. As has been said, there had been several improvements before the last one.

Robins and Jacoby differ as to who the inventor of the plunger drop

was. Each claims to have first suggested it to the other; but I am satisfied that it was Robins' idea. Jacoby himself testified:

"Well, I never understood that he did, although we had some distinction between the two styles I believe but I don't remember what they were. Possibly we designated this new style by Mr. Robins' initials or something. We had an understanding between us sometimes of that nature. I am not certain that we did that."

This emphasizes the difference between the two styles, and indicates quite clearly that the last style, No. 3, was Mr. Robins' invention, and that style No. 2 was Jacoby's. Taking into consideration the order for the drop No. 2 made as late as May 21, 1903, and the fact that the drop No. 3 was not ordered until the following September, that the former was Jacoby's invention, and the latter Robins', it seems quite clear that the improvements mentioned in Jacoby's memorandum of July 7th were the improvements represented by drop No. 2, and not the improvements represented by drop No. 3.

J. G. Donaldson, a witness for the defendants, testified that being in the employ of complainant in 1903, in the latter part of March, he was given a new set of sample trunks which contained this new plunger drop. He himself says that he then knew nothing about electricity, and it is quite unlikely that he would have then known the difference between the drops, even if he had examined them. The same may be said of his testimony relating to the incident at Creston, in April or May, 1903, as was said of Jacoby's testimony when he undertook to fix the early part of 1903 as the time when drop No. 3 was first used. It is hardly possible to believe that this improved drop No. 3 was installed in Donaldson's trunk in March, 1903, and was in his trunk when he was at Creston in April or May, 1903, when we know that as late as the 21st of May of that year the complainant was still buying drop No. 2 in quantities as high as 300.

The unreliability of oral evidence upon such a matter as this of dates is well illustrated by the testimony of Walter E. Stephenson, a witness for the defendant. After identifying the plunger drop now in use by the complainant and the defendants, he testified as follows:

"Q. 10. Will you fix as near as you can the date at which you first knew of that drop being sold on the open market?
"A. About the middle of 1903.
"Q. 11. Do you know what company first put it out?
"A. Yes.
"Q. 12. What company was it?
"A. Patrick, Carter & Wilkins of Philadelphia."

As has been seen, it was conclusively proven that this company never received an order for these drops until September, 1903, and never sent any out of their factory until the 24th of December of that year.

The defendants claim that a record of installations was kept by the complainant which would fix the date at which the drops in question were first placed upon complainant's system; that notice was given to complainant to produce such record, and it declined. Jacoby testified to the keeping of a certain book of records; but I find nothing in his testimony relating to that book which indicates that it shows upon its face what kind of a drop was installed in any particular system therein

mentioned. The only statement which he made bearing upon that particular question was the following:

"Q. 146. Would it, or would it not, be possible from an inspection of that book to fix the date when this drop, complainant's drop No. 3, went into use?

"A. I think I could understand exactly the dates and the bank systems to which they were applied; the various kinds of drop."

McClintock, a witness for complainant, testified as to the general manner in which the company kept evidence of the installations, and said that as far as he knew there was nothing in any of those records which would show the particular kind of drop that was used in any given system.

When it is attempted to defeat a patent by evidence of prior use, "courts have not only imposed upon defendants the burden of proving such devices, but have required that the proof should be clear, satisfactory, and beyond a reasonable doubt." The Barbed Wire Patent, 143 U. S. 275, 12 Sup. Ct. 443, 450, 36 L. Ed. 154; National Hollow Brake Beam Company v. Interchangeable B. B. Co., 106 Fed. 693, 45 C. C. A. 544 (Eighth Circuit).

So far from establishing beyond a reasonable doubt that this plunger drop No. 3 was used in the early part of 1903, the evidence to my mind strongly preponderates toward the contention that they were not used for commercial purposes until they were acquired from the Philadelphia company on December 24, 1903. The patent, therefore, cannot be held void by reason of prior use.

### Grass Patent, No. 880,020. February 25, 1908.

If the points, 16, in the patent appear in the structure, all the witnesses agree that when the lining is pushed in these points will touch the inside of the molding and close the circuit. The defendant, however, does not make use of these points, nor does the complainant.

Complainant's witnesses are not all agreed as to how in the structure actually used by it the circuit is closed in case of a pressing or buckling. Fletcher says:

"And if anybody should press against that lining and press it in they could easily press it in two inches, and in that case this lining buckles up and these edges of the outer lining will start to strike the molding."

He says that the pushing in of the frame from the outside "would simply bend those edges of the outer lining up to such an extent that it will touch the molding."

Again, he says:

"The fact is that when you push the post in it is an attempt to separate the lining, and in doing that you bring those edges up of the lining, and when those edges come up they will strike the sides of the molding; the inside of the molding when you push that post in."

It was claimed by the complainant in the argument that these points, 16, were merely the edge of the outer lining turned inward; so that the theory of this witness is that a pressure from the outside of the vault would push the edge of the outer lining so far in that it would come in contact with the inside of the molding.

Complainant's expert Carter in his direct-examination described only one method of closing the circuit. He said:

"The outer lining plates, however, lap by or approach each other more closely at their margins than the inner lining plates, so that, if the linings buckle inward at the joint, the edges of the molding, 11, are liable to slip off the edge of the inner lining plate on one side and strike the overlapping edge of the outer lining plate behind it, thus closing the circuit."

Upon his cross-examination he gives another way in which the circuit may be closed, and he there said:

"It may occur in either one of two ways, either by the fact that, as the buckling continues, the edge of the plate, 11, on one side will drop down onto the underlapping edge of the outer lining, the edge from which the points, 16, are shown as turned up, and thus short-circuit the system, or it may occur by reason of the fact that the strips, 11, will be forced to move or creep lengthwise on the lining, and particularly with respect to the outer lining, until the metallic edge of the bolt holes of the plate strikes the bolts which extend through from the outer lining frame piece, 8, to hold the moldings or strips in place."

There is nothing in the patent, either in the specifications or the claims, to indicate that Grass had in mind either one of these methods of closing the circuit which Carter explains. It is apparent that his theory as to what would take place if pressure were applied to the outside of the vault is entirely different from the theory of Fletcher.

On the part of the defendant, it is claimed that the points, 16, constitute the essential element of the patent, and that without them it is valueless. The defendant's expert Roberts says:

"It is this inwardly projecting contact point struck up from the outer lining plate with its inner end near the lapping plate, 11, which constitutes the circuit-closing means referred to in each one of the claims in suit of the patent. The structure would be inoperative if it were not for these points, 16."

The defendant further claims that it is impossible to close the circuit by outside pressure with the device used in both complainant's and defendants' systems, without destroying the vault lining. The evidence of the two witnesses Pierce and Jones, is to this effect.

Roberts, in speaking of the two ways mentioned by Carter, says:

"I do not find in the Grass patent any description or suggestion of either of these alleged ways of short-circuiting the plates. It does not appear from the testimony that such ways of short-circuiting the plates of defendants' lining are possible by anything more than a complete breakdown of the lining which would occur upon an abnormal buckling or bending thereof. If defendants' lining were broken into in this manner, there is no telling where the short circuit would occur, if at all. I think it more likely that the insulation itself would be broken through before such crossing of the plates would occur in the manner suggested by Mr. Carter. It is certain that the patent contemplated but the one way described therein for closing the circuit upon the buckling of the plates. The patentee states in the portion there quoted in the specifications that any attempt to tamper with the wall would be 'instantly detected.' It is the proximity of the points, 16, to the curve plate which insures such instantaneous operation and detection of a tampering with the walls."

An examination of the exhibits which have been presented seems to indicate that it would be practically impossible to close the circuit either in the way mentioned by Fletcher, or in either one of the ways mentioned by Carter, without breaking some part of the structure.

The points, 16, not being used by the defendant, it has not infringed the patent.

But it is said by complainant that the points, 16, are not the only means by which the circuit can be closed, and that the means actually employed by the complainant in its structure, and referred to in all of the claims except the fifth and seventh, are the extension of the outer lining beyond the insulated material.

While the evidence shows that in the model made by Jacoby seen by one of the witnesses upon his desk the insulating material extended to the edge of the outside plate, yet it seems to be sufficiently proven in the case by the testimony of witnesses and by the defendants' exhibit, "Complainant's vault lining," that in the vault lining used by the complainant as early as 1903 the insulating material did not extend to the edge of the outside plate. Thomas, a witness for the defendants, testified that a molding with wooden strips similar to the exhibit last named was used by the complainant in the first part of the year 1903.

Later, and about 1904, complainant substituted for the wooden strip a curved metal molding. Upon the question whether the curved metal molding was not a mechanical equivalent of the wooden molding with metal tips, the defendants' expert testified as follows:

"The wooden strip with metal pieces and inwardly turned points thereof, by which the joints between the sections of the linings are covered and the lining circuit made continuous from section to section, is the full equivalent of the metal strip, defendants' exhibit, complainant's molding and washer. Both perform the same functions in the same manner. They are equally good as far as the results secured are concerned. The curved metal plate is possibly stronger, but I should say the wooden strip was plenty strong enough. The substitution of one for the other would be well within the skill of an ordinary mechanic. The metal strip being of metal and required to be insulated from the bolt passing through it, an insulating washer is employed for the purpose. The washer is provided with an indented seat in the strip. This method of insulating a bolt and seating a washer was well known, and is commonly used in electrical arts, and has been for many years."

I accept his view on this question.

The result, as far as this Grass patent is concerned, is that the bill cannot be maintained.

Robins & Jacoby Patent, No. 771,748. October 4, 1904.

Clocks have long been used to effect the breaking of an electrical magnetic circuit at any particular time of the day and to keep it broken for a determined period thereafter if desirable. In the patent of Holmes, No. 63,158, granted in 1867, the purpose of the invention is stated in the words above quoted. It follows, therefore, to use the language of defendants' expert:

"It thus appears that the only novelty, if there is any, in the Robins & Jacoby patent mechanism, as described in the claims in suit, lies in the particular mechanism of the circuit closer and its arrangement with respect to the mechanism of the clock."

It is true that the defendants' clock accomplishes the same result; but if it does not use the means employed by the complainant, or something which is the mechanical equivalent of those, there is no infringement.

A comparison of the two structures with a reading of the testimony of the complainant's expert is alone sufficient to show that the two devices are entirely different. The defendants' expert says:

"It is unlike the Robins & Jacoby mechanism in every respect, except that it is a time mechanism and controls an electric alarm circuit just as numerous structures of the prior art are time mechanisms controlling an electric circuit."

It follows, therefore, that as to this patent the bill cannot be sustained.

Robins & Jacoby Patent, No. 771,749. October 4, 1904.

In the patent to Carr, No. 490,870, January 31, 1893, it is said that the object of the patent is to provide an electrical magnetic alarm signal and an indicating apparatus at a central or police station, operated automatically by circuit-closing devices in the safe, designed to be actuated by any attempt to manipulate the lock or to enter the safe, on the part of any unauthorized person.

It is claimed, however, by complainant, that, so far as claims 1, 4, and 15 are concerned, there is included the element of a test bell, and that the object of the invention is to provide for indicating by such bell, when the bolts are thrown in the daytime, that the system is in working order. It may be conceded, as claimed by complainant's expert, Carter, that the test circuit in the Stern patent is for an entirely different purpose.

But though the testing feature of the apparatus may be novel, yet complainant is not entitled to a monopoly of all kinds of circuit closers by which the desired test may be brought about. It must be limited to the circuit closer described in the patent, or to one which is its mechanical equivalent.

It may be observed, in passing, that the construction of the complainant does not follow the patent; the complainant having placed the springs on the bolts, instead of placing them on the door.

When the two devices are examined, that of the complainant and that of the defendant, it is seen that they are entirely different. They accomplish, it is true, the same result; but they do not do it in substantially the same way nor by substantially the same means.

The complainant's expert, Carter, had some difficulty in selecting from the defendants' construction the parts which correspond with the elements of these three claims. He said, for example, on page 553 of complainant's record:

"I do not know that I would specify any particular part of defendants' construction which responded precisely to the 'contact plate' of this claim."

He also testified:

"So far as its function as a contact goes, the part of defendants' structure which corresponds to the 'contact plate' * * * is one of the knife-edged contacts."

Claim 22 relates to the dial combination.

In the patent to Shubert, No. 429,817, dated June 10, 1890, it is said:

"My invention relates to that class of alarms which are adapted to sound upon the turning of the knob and opening of the door."

There is nothing new, then, in the idea of sounding an alarm when the combination is turned. As in the case of the other claim, an examination of the two devices shows no similarity, except that, in view of the shape of the dial, they both necessarily have a circular part.

Complainant's expert, in selecting from defendants' structure the elements of the patent, was forced to say that the insulated member of the patent is the metallic disc of the defendants' device, although that disc is not insulated from the bolt work nor from the locktumbler; his theory apparently being that it is insulated because normally it is not in contact with the screw head. When asked what were the means provided in said tumbler and co-operating with said member, to normally hold it out of contact with said surface, he answered that these means were the notch in the head of the disc, together with the connection of the disc and dial spindle.

Claims 3 and 6 are apparently for a combination of a time circuit closer and door bolt circuit closer and a gong circuit, and it is claimed that this combination is new.

As has been said, the combination of the door bolt circuit and the gong circuit was old.

As to the combination of the time circuit closer and the door bolt circuit closer, the patent of Rousseau, No. 246,211, August 23, 1881, says:

"Whereby a certain section of a burglar alarm may be switched out of action at a particular hour to allow the opening of certain windows or doors without giving the alarm."

In the patent to Holmes, No. 63,158, May 26, 1867, it is said:

"The purpose of my invention is to effect the breaking of an electro-magnetic circuit at any particular time of the day, and to keep it broken for a determined period thereafter, if desirable."

It thus appears that there existed a combination of a door circuit with a gong circuit, and there also existed a combination of a door circuit with a time circuit closer.

It may be admitted that the combination of the three elements has not appeared before; but, with the two combinations already mentioned, it did not, in my opinion, require invention to unite them. Richards v. Chase Elevator Co., 158 U. S. 299, 15 Sup. Ct. 831, 39 L. Ed. 991.

The bill cannot be maintained as to any one of the claims in suit.

Robinson & Green Patent, No. 708,496. September 2, 1902.

This patent has been held valid by the Circuit Court for the Eastern District of Tennessee, in a decision filed October 7, 1909, in American Bank Protection Company v. City National Bank of Johnson City, Tennessee, 181 Fed. 375.

That decision should be followed in this case, if the evidence in both cases is substantially the same. Office Specialty Mfg. Co. v. Winternight & Cornyn Mfg. Co. (C. C.) 67 Fed. 928.

Of the prior patents relied upon by defendants in this suit, the following were set up in the answer in that suit: Rowell & Duncan, No. 122,913; Duncan & Rowell, No. 109,193; William Duncan, No. 117,-

713; two patents to Freed, No. 667,123 and No. 626,684; Coleman patents, No. 11,626 reissue; No. 667,115; No. 666,737; No. 587,931; James W. and William D. Gilstrap, No. 530,411; Abraham T. Metcalf and Venning and D. Simons, No. 680,982; the German patent, Nicolaus, No. 60,594; John A. McGahy, No. 573,903; Scholes & Myers, No. 532,291.

The experts of the respective parties in this case are practically agreed that the wall of the vault is an essential element of the patent. Carter says:

"On the other hand, the essential contemplation of this Robinson & Green patent is that the shield shall guard the gong simply by being maintained in a certain necessary position with regard to the vault; that is to say, against the outside wall of the vault."

And again:

"On the other hand, the essential idea of the protection afforded the gong on the wall of the vault in the Robinson & Green patent is that it is the placing of the shield over the gong, and maintaining it in this fixed relation to the wall of the vault, that protects the gong. * * *

"On the other hand, the essential idea of the Robinson & Green patent is that the protection is afforded by establishing a certain undisturbable relation between the vault and the shield. * * *

"This location of the shield upon the vault wall is of the very essence of the Robinson & Green improvement, as I understand it, as Mr. Roberts has stated."

Roberts, the defendants' expert, testified:

"The Robinson & Green shield, however, is in its very nature a device which could be placed nowhere else than on the vault wall. * * *

"While the Robinson & Green shield is necessarily and essentially a device which must be placed upon the vault wall, in order that the means co-operating with the shield upon a movement thereof may be inclosed and protected by the vault."

In the case referred to from the Eastern district of Tennessee, Judge Sanford said:

"That the words used in the several claims * * * 'located outside the vault,' and other similar places, when construed in connection with the specifications and designs, all refer to the location of the gong on the outside wall of the vault."

This wall being one of the essential elements of the patent, an examination of those patents relied upon by the defendants, and not set up in the answer in the Tennessee case, shows that they do not cover or refer to the invention contained in the Robinson & Green patent. Roberts says:

"If the claim is construed, however, to cover substantially the structure of the Robinson & Green patent, in which the wall is a separating element between the shield and the circuit-closing means connected therewith through the wall, then I do not find the whole arrangement in any one patent of the prior art."

The next and most important question is whether the structure of the defendant is so far similar to the structure of the patent as to infringe it. Defendants' expert has pointed out several differences between the two structures, the most important one of which, apparently, in his opinion, lies in the fact, as claimed by him, that the defendants' shield

can be entirely removed from the wall of the vault without sounding an alarm, while that of complainant's cannot. He says that the defendants' shield can be placed anywhere, and that the alarm is sounded, not by a movement of the shield from the wall, but by a disturbance of portions of the shield itself.

Assuming that the defendants' shield can be removed from the wall without sounding the alarm, it is claimed by complainant that defendants' structure would be useless if located away from the wall. It is admitted by defendants' expert that, in case the shield were located away from the wall, it would be necessary to have the conductors between it and the vault protected, as well as other portions of the structure.

It seems plain, as claimed by plaintiff's expert, Carter, that if located elsewhere the situation would be precisely the same as that which exists with regard to the outside alarm in the defendants' system. This shield would have to be inclosed in a protective housing, and, when thus inclosed in a protective housing which could not be penetrated without sounding an alarm, it is difficult to see what would be the value of the claimed peculiarity of defendants' structure, namely, the sounding of the gong only upon the relative disturbance of parts of the structure already inclosed in the protective housing.

Upon the question as to whether or not the defendants' shield could be removed from the vault without sounding an alarm, the experts differ. Roberts says repeatedly that it can be done; his theory being that, the flat spring being fastened to the baseboard, and the baseboard being firmly fastened to the curved shield, and the shield firmly fastened to the bolt which passes through the wall, any movement of the bolt would necessarily move the curved shield and the baseboard at the same time. The spring on the baseboard would therefore maintain its relative position to the insulating collar on the bolt.

Carter, on the other hand, says that the defendants' shield cannot be removed from the wall without causing an alarm to be sounded. He, moreover, says:

"As a matter of fact I do not see any warrant or reason for calling the plate on which the gong is mounted any part of the shield."

And again:

"To attempt to distinguish between the vault wall and the board which is nailed to the vault as a plate for the gong is utterly idle. This board or base plate is a mere incident of the construction of both the Robinson & Green patent and of defendants' device. In both cases the gong might be nailed or fastened to the face of the wall without any baseboard, with substantially the same result. The inclusion of the baseboard is a mere matter of convenience."

If the flat spring in defendants' device were fastened to the wall of the vault, instead of being fastened to the baseboard, it would operate in substantially the same manner as does the complainant's device when the shield is taken bodily from the wall. That the defendants' spring might as well be placed upon the vault wall as upon the baseboard, seems to be also the opinion of the defendants' expert. In describing the defendants' system, he says:

"The shield is further provided with a simple form of circuit closer comprising a spring secured to the vault wall with its free end resting on an insulated

collar of the bolt which holds the shield to the wall. If the shield is forcibly withdrawn in an attempt to uncover the alarm bell or gong, the spring would come in contact with the bolt, and the alarm would be sounded."

The last part of this quotation would seem to indicate that Roberts was then of the opinion that the alarm would be sounded if the shield were separated from the wall.

That the baseboard is not an essential part of the defendants' device is also indicated by him when he says:

"It might be placed away from the vault and fastened to another wall or ceiling or floor, and it would operate in the same way to sound an alarm upon an attempt to lift the shield from the body to which it was secured."

With the flat spring of the defendants' system placed upon the wall itself, the fact that its circuit closer would be outside of the vault, instead of inside, is not a sufficient change from complainant's device so as to enable it to escape the charge of infringement.

The other differences pointed out by Roberts in his testimony are not important. As for example, that the complainant's has a tube alone passing through the wall, while the defendants' has a tube and a bolt.

The complainant has made use in its system of certain features which do not appear in the patent; the spring contact, the sand trip, and the inner lining. But of all these improvements it may be said, in the language of plaintiff's expert, as follows:

"XQ. 587. Without the addition of either the spring or the sand trip or the inner lining, was it a device operative to prevent drilling or other attacks which might be made on the mechanism through the shield without moving it?

"A. I should say that it was operative and a very excellent protection. It was not as complete a protection as it is now, or as it is with these additions, and particularly with the addition of the lining. The other additions are less important."

And again:

"There is no question but what the shields as made and installed by complainant and defendants are more effectively protected and afford more effective protection than the exact arrangement shown in the Robinson & Green patent, but the difference is simply a matter of degree."

And further:

"But I do not see that this fact is of any importance, or militates against the fact that the shield construction shown by this Robinson & Green patent does afford a very considerable degree of security, if made just as it is shown, and is the substantial basis of shield construction employed by defendants."

What has been heretofore said in regard to the similarity between defendants' structure and that of complainant's has had reference to claims 1, 2, 3, 7, 8, and 10, and these claims are infringed by defendants' device.

I consider that claims 12 and 13 should be construed with claims 9 and 11, as indicated by defendants' expert on page 274. As thus construed, they relate to the means of causing an alarm to be sounded when a metallic instrument is inserted through the perforation in the shield; the circuit being thus closed between the shield and the frame of the gong. Such a circuit could not be closed in that manner in the defendants' device, because it has within the curved surface of the shield an inner lining which is not perforated, and no metallic instru-

ment could ever reach from the outside of the shield to the frame of the gong.

My opinion, therefore, is that these claims are not infringed by the defendants' structure.

It may be added that the defendants' claim under a patent to Jones; but the device actually used by defendants more nearly resembles the complainant's structure than it does the structure mentioned in the Jones' patent.

Coleman Reissue, No. 11,626.   August 17, 1897.<br>Original Patent November 10, 1896.

Claim 6 does not include the element of the time mechanism.

The idea contained in the claim as it reads is completely shown in patent to Rothenberger, No. 523,946, July 31, 1894. If the word "electrical" were omitted from the second line of claim 6 of the Coleman reissue, and the word "pneumatic" substituted therefor, the claim as thus amended would express exactly the Rothenberger idea. Complainant's expert practically so testifies. That system, however, was largely a pneumatic one, while complainant's is electrical.

Without considering the other prior patents referred to in the testimony, I come directly to the patent to Stern, No. 351,408, October 26, 1886, and treat that without considering the evidence of Stern himself relating to the manner in which his invention was used. Upon the question as to whether claim 6 is found in this patent of Stern, Carter testifies as follows:

"XQ. 75. Then, as I understand you, in order to make this Stern device correspond with the disclosure of the sixth claim of the Coleman reissue patent, it would only be necessary to enlarge the box shown in Fig. 4, and to cover the slot as shown in that box with the same electrically protected envelope which incloses the rest of the box?

"A. It would only be necessary to enlarge this box and close it up entirely, as you suggest, and then to place in it the entire alarm station mechanism shown in Fig. 2, including the relay instrument, the bell, and the battery; that is to say, that is all that would be necessary theoretically and so far as the construction that this claim actually sets forth is concerned. Practically, however, as I have already said, a system constructed out of the Stern system thus modified would be of no use unless provided with some automatic clock-controlled throw-off for enabling the protected premises to be entered at some time without sounding the alarm."

Whether the figures in the Stern patent show that all the instruments at the alarm station were to be included in the electrical envelope, I do not think very important. It may be that the bell, being common to several subscribers, was not so included, and perhaps the battery was not. But however that may be, the idea that all of the instruments at the alarm station might be so included is clearly shown upon line 85, of page 3, where it is said:

"In my improved system of burglar alarms the instruments at the alarm station are all preferably incased as shown in Fig. 4, and protected with an electrical envelope so as to prevent tampering with the instruments."

Coleman had bought this Stern patent in the latter part of 1895, or in the early part of 1896. This was before he made his application for

a reissue. The idea was therefore actually suggested to him by the patent itself.

It is said, however, by the complainant, that the alarm station provided for in the Stern patent is not entirely protected, although all the instruments may be therein, because there projects a visual signal, and a person upon the outside of the station could easily put the system out of operation by tampering with this signal. The idea of incasing the entire alarm station in an electrical envelope is suggested by Stern. To change his design by eliminating the visual signal would not, in my opinion, amount to invention.

The complainant says, also, that the Stern device was designed for a central station. Passing the point made by the defendants that Coleman suggests in his own patent its use at a central station, it seems that the location of the alarm station at an isolated point would not be such a change from Stern's idea as would amount to invention.

It follows, therefore, that the bill cannot be maintained as far as claim 6 is concerned.

Claim 21 adds simply to claim 6 the element of the braided cable. Carter testified that if the defendants do not use the braided cable they do not infringe this claim. He also testified that they did not in fact use a braided cable. He did say, however, that defendants used a twisted cable; but it is apparent from his testimony that he did not believe that the wires were intentionally twisted in the defendants' cable, so as to produce the same effect as that produced by the braided cable. But in no event was there any novelty in the use of a braided cable for this purpose. See patent to Larned, No. 181,078.

Roberts, the defendants' expert, considers that claims 18 and 20 are substantially the same. They add to claim 6 the element of time mechanism.

The elements of this claim are old. There had been clocks which automatically opened vault doors before. Patents to Pierce, Nos. 287,775 and 322,317. There had been vaults electrically protected. Patent to Smith, No. 251,071. There had been alarm stations separate from the vault electrically protected. Patent to Stern, No. 351,408. There had been the combination of an electrically protected alarm station and an electrically protected vault. Patent to Rothenberger, No. 523,946, and the patent to Stern, supra.. But there had never been before any combination of a protected alarm station, a protected vault, and a clock mechanism which automatically opened the vault at a predetermined time. In each one of the patents referred to by Roberts there was some exposed point. As said by Carter:

"In each case he overlooks and ignores the exposure of some one or more vital feature of the system, and the complete absence of the fundamental conception of providing an isolated, as distinguished from a central, station system, and a system which is completely inclosed and self-protecting, as distinguished from one which is exposed in one or more particulars and requires a human guard or watchman to complete the protection which it is supposed to afford. Rothenberger was the only prior patentee who had a similar conception, and Rothenberger, as we have seen, discloses simply a visionary scheme of protection which in the first place was substantially pneumatic, instead of being entirely electric, as Coleman contemplates, and which in the second place was obviously incapable of ever being reduced to a practically operative form."

Although Rothenberger and Stern had both the alarm station and the vault protected, yet neither one of them had a clock, and therefore, under neither of these devices, after the system had been put in operation, could the owner himself enter the guarded structure without sounding an alarm. The idea that this should be done apparently never occurred to either one of them. It would not naturally occur to Stern, because his guarded structure was a dwelling house, and the owner living inside the house could at any time turn off the alarm.

It remained for Coleman to see that a device would be practically useless if the banker could not get into his vault each morning without sounding a general alarm. After he had seen this, he used a clock mechanism to obviate this difficulty.

Carter says upon this point:

"For if we assume a completely self-contained and self-protecting burglar alarm system which renders not only the protected premises, but the alarm station and connecting conductors, incapable of being attacked, controlled, or manipulated in any way whatsoever without sounding the alarm, it is obvious that the protection thus provided, when once started, would permanently obtain in the absence of some feature of the system by which it would be made to automatically throw itself out of operation at the end of the desired protected period. Without such provision, obviously the vault could not be opened even at the opening of business hours without bringing the alarm mechanism into operation and unnecessarily rousing the community by the sounding of a false alarm."

And again:

"In connection with the Duncan & Rowell system of the Haseltine British patent and the United States patents to Duncan, Duncan & Rowell, and Rowell & Duncan, and in connection with this Rothenberger patent as well, it may be again pointed out that a practical self-contained and self-protecting burglar alarm system such as Coleman contemplated and provided (one in which all necessity of a watchman is done away with) necessarily involves the provision of a clock-controlled device for turning off or rendering inoperative the alarm system when it is desired to open the vault for legitimate purposes (at the opening of business hours). And one criterion by which to determine whether or not the system of the Coleman patent is practically embodied in any prior art device is the presence or absence in the system of this clock-controlled mechanism. Where reliance is had upon alarming the community to protect the bank, by attracting their attention to the fact that the bank alarm is being sounded, it is obviously out of the question to permit the alarm to be frequently sounded as a false alarm, i. e., when no attack is being made on the system, and when it is not wished that any attention should be paid to the alarm. And since the only possible way in which the alarm can be prevented from sounding, in such a completely self-contained and self-protecting system, is to have the alarm connections automatically discontinued by clock mechanism within the system itself, the failure of any prior patent to show such clock mechanism conclusively demonstrates either that a completely self-protecting and self-contained system was not contemplated, or that the patentee failed to understand the necessities of such a system and has shown in his patent simply some impractical system existing purely in his imagination."

And again:

"And if it was true that all that Coleman did in this particular was to inclose a time operated controlling mechanism within the protected structure, so as to bring the protection to an end at a predetermined hour and permit the vault to be legitimately opened without unnecessarily arousing the community by sounding the alarm, this in itself was a conception of the greatest

practical merit indicative, as it seems to me, not only of invention, but invention of a very high order."

I agree with this last statement of complainant's expert, and consider that, so far as claims 18 and 20 are concerned, Coleman was an inventor.

The Sutton & Steel patent was issued June 22, 1897. The original Coleman patent was issued on November 10, 1896. In considering the validity of the reissue patent, I have not taken into account the Sutton & Steel patent. Anderson v. Collins, 122 Fed. 458, 58 C. C. A. 669; Roth v. Harris, 168 Fed. 279, 93 C. C. A. 581.

It remains to consider whether the defendants' system infringes claims 18 and 20 of the reissue patent.

The defendants have a guarded structure, a guarded housing in which the alarm is located, an electrical alarm system, and a time mechanism, all protected. The fact that the reissue patent shows only one alarm gong, while the defendants as well as the complainant have added several alarm gongs, is not at all material upon the question of infringement.

As Carter says in his testimony, any number of gongs could have been added to the Coleman system, and it is apparent that the defendants have made use of the one alarm gong which Coleman did provide.

The defendants having used these elements which are mentioned in the patent, do they operate in substantially the same way as those of the patent? With reference to the clock mechanism, it will be noticed that Coleman specifies no kind of a clock. The fact that the specific clock used by the defendants does not infringe the Robins & Jacoby patent does not necessarily indicate that the use of that particular clock would not be an infringement of claims 18 and 20 of the reissue patent. As to the operation of the clock, Coleman says, on page 3, line 62, of the patent, that he specifies no particular kind of a switch; in fact, he does indicate in the patent two kinds. Roberts says that the opening by a switch, first of the local alarm circuit, and then of the meter circuit, is peculiar to Coleman. But this was necessary, for Coleman at that time shut off his entire system during the daytime. He thus removed the entire protection, and it was necessary that he should open the local alarm circuit first; otherwise it would sound an alarm.

Roberts also says that the defendants' device does not shut off the alarm circuit as does Coleman's, but simply cuts out of the alarm circuit the combination lock dial and door bolt circuit. This, however, was nothing but a change suggested by the improvement afterwards made by Coleman himself in a subsequent patent, which cut out the door circuit, leaving the rest of the system operative in the daytime.

It is apparent that defendants, as Carter says, have utilized the essential and valuable idea involved in the time mechanism feature of the Coleman patent.

The defendants insist that the essential element of the Coleman system is its so-called "meter," that this meter responded to variations in the current, and that the defendants have nothing in their system which is similar thereto. It is true that nothing in the defendants' system would respond to an increase in the current; but, if the current is so far "varied" as to entirely stop, then the defendants' device does

respond. That Coleman used the word "variation" to include an entire cessation of the current is indicated on page 2, line 130, of the patent.

Complainant's theory is that this so-called "meter" is nothing but a circuit closer. It was used in the Coleman patent for the purpose of sounding an alarm, in case of an interruption of the closed circuit, or the closing of the open circuit. A circuit-closing device is used by the defendants for the same purpose. It is true that the defendants' device does not accomplish all that Coleman's device did, as it does not respond to all variations of the current.

With regard to these claims 18 and 20, a construction should be given to them sufficiently broad to make the circuit-closing device used by the defendants equivalent to that employed by Coleman.

Considerable space in the testimony is given to the number of circuits employed by the two systems, and particularly as to which in each system can be called the "main protective circuit." That Coleman employed two circuits, one normally open and the other normally closed, is plain from a mere reading of the patent.

Roberts himself in his testimony would not say that the statement of Coleman to this effect was incorrect. That the defendants have two circuits, one normally open and the other normally closed, is admitted. They say, however, that the normally closed circuit is only for the protection of the cable, and that the protection to the structure is furnished by the open circuits.

When the experts came to consider which in each system was the main protective circuit, they were indefinite. For example, Roberts was asked:

"Q. Do you find in the defendants' burglar alarm system a main protective circuit?

"A. I will answer yes and no."

Carter repeatedly said that it depended upon the use of the word "main"; and apparently each expert at different times, when treating of different parts of the system, called one circuit the "main circuit," and at other times called another circuit the "main circuit." For the purposes of these claims, however, under the construction which I think should be given to them, the circuit system used by the defendants, in my opinion, constitutes an infringement of the patent.

The result is that as to these claims the bill can be maintained.

### Patent to Coleman, No. 626,670. June 13, 1899.

The Coleman reissue patent provided for taking the protection off the whole system during the daytime, and restoring it during the night-time. The purpose of this patent is to allow the protection to remain during the daytime upon all the system except the door.

Carter says in his testimony:

"Claim 1, as will presently be seen, is broadly to this feature of automatically cutting out the protection of the door circuit alone at the opening of business hours."

Speaking of the defendants' system, he says:

"As compared with this arrangement, defendants' system shows a number of differences to which I shall presently refer, but which are not involved in

the broad statement of this feature embodied in claim 1. Defendants' system does follow and embody the substantial advantages of this arrangement, in that it also provides for the cutting out of the protection from the door circuit automatically, and by a time mechanism located within the vault, at the beginning of business hours, so that it will thereafter be possible to enter the vault without sounding an alarm, and so that at the same time the protection will be left on the other parts of the system."

Thus broadly considered, the claim is anticipated by the patent to Rousseau, No. 246,211, August 23, 1881. This patent says, line 7, page 1:

. "The object of this invention is to provide an attachment or device for use in connection with a clock and a battery, and with burglar alarms, * * * whereby certain effects may be produced at set times. For instance, * * * secondly, whereby a certain section of the burglar alarms may be switched out of action at a particular hour, to allow the opening of certain windows or doors, without giving an alarm."

Carter says in his testimony that this patent simply shows a circuit-closing clock mechanism per se, and he is unable to perceive wherein it has any bearing on the combination of this claim.

It would appear, however, that the idea embodied in this Coleman patent was specifically stated by Rousseau in his patent.

The claim in the Coleman patent can therefore be sustained only as to the means by which the result is brought about.

As to the defendants' system, Carter says, as has been seen, that it embodies the substantial advantages of the Coleman arrangement. But that is not sufficient to show infringement. The defendants must have acquired the substantial advantages of the patent by the same means that Coleman employed, or by equivalent means.

An examination of the defendants' system and the Coleman patent, by referring to the testimony of Carter, and particularly to his cross-examination, is sufficient to show that the defendants not only do not employ the same means as those employed by Coleman, but that the means employed by them are entirely dissimilar, and are in no sense the equivalent of the means shown in the patent.

As to this patent, the bill cannot be maintained.

Patent to Coleman, No. 627,054. June 13, 1899.

Claim 17 is the only claim involved. That claim is as follows:

"In an electrical burglar alarm system, the combination with a main circuit extending between the guarded structure and an alarm station, and an alarm circuit located at the alarm station and having a switch and means for holding it normally closed, of an electromagnet for opening said switch, a circuit including it and extending to the guarded structure, and means for testing the alarm mechanism, substantially as set forth."

Carter's theory seems to be that the plaintiff can prevent the use of any means whatever for testing the alarm mechanism when such mechanism is in a guarded housing and is operated from a guarded structure.

He said:

"It is apparent that claim 17 is not limited to this specific arrangement, but is broadly phrased to express in general terms the feature of improvement to which I have called attention. i. e., the feature of enabling the local battery

in the isolated and inaccessible outside alarm station to be tested from the vault without requiring the alarm station to be visited for the purpose."

But this theory cannot be sustained. The plaintiff must be limited to the means set out in the patent, or to equivalent means.

The means described in the patent for securing the test are, among other things, a galvanometer and a switch, and the test resulting is an inaudible one. The galvanometer here described is not the "meter" referred to in the Coleman reissue patent. It is not a circuit-closing device, but is a real measuring instrument. Carter says this in substance, when he states:

"This is not the meter, galvanometer, or relay which responds to variations in current and serves to turn in an alarm thereby, but is a simple current-measuring instrument located in the guarded structure and used for the purpose of measuring the current in the local battery when the test circuit is completed."

The experts agree that in the defendants' system the test is made by opening the normally closed circuit. Roberts also says that not only the gong in the alarm station is sounded on such an occasion, but also all the other bells.

Carter says that the test is brought about in the same way as it would be if the cable connecting the vault and the housing were severed in an attack upon the system.

The system is tested, according to the patent, by measuring the current with a galvanometer, and the test is an inaudible one.

The defendants have no galvanometer, they do not measure the current, and the test is made by actually ringing the bells; so, of course, it is an audible one. Other differences between the defendants' system and that of the patent are pointed out in the cross-examination of Carter.

The means employed by the defendants are not the means set forth in the patent, nor are they equivalent of such means.

The bill cannot be maintained as to this patent.

Patent to Coleman, No. 632,513.   September 5, 1899.

Carter in his testimony says:

"The improvement which this patent sets forth, and which constitutes the subject-matter of claim 1, consists in providing for a cutting out of the protection of the door of the housing from a point within the vault without withdrawing the protection from the rest of the system."

He practically repeats this statement in his redirect examination, and in his cross-examination.

Roberts says:

"In fact, the whole of the protection at the housing in defendants' system is removed by opening the switch, while in the system of the Coleman patent the shunt is intended to remove protection only or especially at the door contact."

This positive statement of Roberts is nowhere expressly contradicted by Carter. The latter says, to be sure, in speaking of defendants' system:

"Nor will the protection to the cable and housing by reason of the closed circuit be disturbed or withdrawn."

But upon the same page he says that the protecting circuit of the door bolts in defendants' system is a normally open circuit.

In his direct examination and cross-examination he is very indefinite upon the question as to whether in the defendants' system the protection is taken off from the entire housing or not, but in his redirect examination, speaking of the defendants' system, he says:

"In that system the cutting out of the protection to the outer housing, so as to permit the latter to be freely entered, is permitted by a switch within the protected structure."

He thus apparently concedes what Robert positively states, that the defendants' device has nothing to do with the door of the housing, but that it cuts out the protection from the entire housing.

In the patent the bolt contacts to the door of the housing are cut out by making a shunt path for the current around them, leaving the protection upon the rest of the housing. It is conceded that the defendants have no device of that kind. They have no shunt for the current, but the protection for the entire housing is cut off by breaking the current by means of switch No. 2.

Without then considering whether there is any difference in substance between this patent and the Coleman patent No. 626,670, it seems plain that the defendants have not infringed the former; for it cannot be seriously insisted that claim 1 prevents the use of any device whatever by the operation of which the outside housing of a burglar alarm system can be entered without sounding a general alarm.

As to this patent the bill cannot be maintained.

### Patent to Coleman, No. 667,115. January 29, 1901.

Many devices are mentioned in this patent; but the only one in litigation here is that referred to in claims 12, 13, 14, and 15. The determination of the questions relating to these claims does not seem to be very important, in view of the fact that since the bill was filed the defendants have changed their device, and are not now using any springs which are controlled by the bolts.

If, however, the bill could at the time it was filed be maintained, it would seem that the complainant would be entitled to an injunction and an accounting.

With reference to the prior patents relating to the same subject, Roberts stated that, if claim 12 was to be construed as complainant's expert construed it, he found the combination and arrangement in several of the prior patents, and he added:

"If, however, the claim is construed as limited to the circuit and structural details, as in my opinion it should be, then I do not find the claim in any one structure of the prior art."

These claims cannot receive the construction suggested by Carter. They should be limited as indicated by Roberts. As so limited, they are in my opinion valid.

That the defendants have infringed them seems apparent. They use a screw bolt as does the complainant. When the bolt is unscrewed, that act closes the circuit and sounds an alarm. In the complainant's device,

when the bolt is unscrewed, that act opens the circuit and sounds an alarm. This is a difference that is not material.

Coleman uses two springs touching a metallic plunger attached to a bolt to complete the circuit. When the metallic plunger is withdrawn by unscrewing the bolt, the circuit is broken and the alarm sounded.

The defendants employ only one flat spring, which is pressed away from its contact point when the bolt is screwed home, and when the bolt is withdrawn it meets it, closing the circuit. This is an equivalent of the complainant's device.

As to this patent, therefore, the bill can be maintained.

## Individual Defendants.

The principal defendant in the case is the Electric Protection Company, a corporation. Seven persons are joined with the corporation as defendants, and as to them the bill alleges that they are directors and stockholders of the company, and that:

"For the purpose of inducing the users and purchasers of electric burglar alarms to purchase the infringing devices manufactured and sold by said Electric Protection Company, said individual defendants, and each thereof, have promised and guaranteed that they will defend and save harmless every purchaser of electric burglar alarms manufactured and sold by said Electric Protection Company against all suits for infringement of patents."

In support of the allegations of the bill in this respect, the complainant introduced in evidence a document signed by the individual defendants, which is known as "complainant's Exhibit A-10." The mere signing of this document, without more, would not, under recent controlling authorities, be sufficient to justify the joining of these directors as defendants.

The evidence in the case does not show that the document when signed was used for the purpose of inducing persons to buy the system of the defendants. Each of these defendants was examined as a witness by the complainant, and no one of them testified that it was ever used to his knowledge to induce purchases; but they all, except Carothers, who was not interrogated on that point, testified that the purpose was to effect settlements and procure payments from persons to whom systems had already been sold.

Under these circumstances, the bill cannot be maintained against these defendants. Glucose Sugar Refining Co. v. St. Louis Syrup Co. (C. C.) 135 Fed. 540.

The authorities cited by the complainant in its bill do not indicate that it is entitled to any relief against these directors. What is said in the case of Peters v. Union Biscuit Co. (C. C.) 120 Fed. 679, was distinguished and disapproved of by Judge Adams, who wrote the opinion in that case and in the subsequent case above cited of Glucose Sugar Refining Co. v. St. Louis Syrup Co. In the case of Simplex Electric Heating Co. v. Leonard (C. C.) 147 Fed. 744, it was said that the corporation was used by the individual directors as a cloak or cover for their operations. In the case of Harrington v. Atlantic & Pacific Telegraph Co. (C. C.) 143 Fed. 329, the individual joined was Jay Gould, who had made a contract which was the basis of the suit, and who was the owner or controller of a majority of the stock of the de-

fendant company. The case of National Cash Register Co. v. Leland, 94 Fed. 502, 510, 37 C. C. A. 372, was an action at law, and the court said that the same rule did not necessarily apply in a suit in equity. In the case of Hutter v. De Quincy Bottle Stopper Co., 128 Fed. 283, 62 C. C. A. 652 (Second Circuit), it was said that the officers could not be made liable unless they personally directed the infringement. In the case of Cazier v. Mackie-Lovejoy Mfg. Co., 138 Fed. 654, 71 C. C. A. 104 (Seventh Circuit), the directors were held not liable. In the case of Calculagraph Co. v. Wilson (C. C.) 132 Fed. 20, the corporation was not made a defendant, and the court said that Wilson could not shield himself behind the corporation.

As to these defendants, the bill should be dismissed. Under the circumstances, however, no costs will be allowed them. Tyler v. Galloway (C. C.) 13 Fed. 477.

The complainant has not prevailed upon all of its claims in the Coleman reissue, nor in the Robinson & Green patents. It is not, therefore, entitled to costs with reference to these patents: Fairbanks, Morse & Co. v. Stickney, 123 Fed. 79, 59 C. C. A. 209 (Eighth Circuit).

It has prevailed upon all of its claims in the Robins patent, and in the patent to Coleman, No. 667,115. Upon the other patents in litigation the defendant company has prevailed.

The question of costs as between the complainant and the defendant company I will leave for determination when the final decree is entered.

Let a decree be entered dismissing the bill without costs as to the defendants Alvin Robertson, H. N. Stabeck, W. E. Jones, George E. Towle, W. A. Laidlaw, C. H. Baldwin, and Charles Carothers.

Let a decree be entered against the defendant Electric Protection Company for a permanent injunction and an accounting, as prayed for in the bill:

(1) As to claims 1, 2, 3, 4, and 5, of the patent to Robins, No. 850,101.

(2) As to claims 1, 2, 3, 7, 8, and 10 of the patent to Robinson & Green, No. 708,496.

(3) As to claims 18 and 20 of the Coleman reissue patent, No. 11,626.

(4) As to claims 12, 13, 14, and 15, of the patent to Coleman, No. 667,115.

Let a decree be entered dismissing the bill as to the defendant Electric Protection Company: So far as it relates to claims 6 and 21, of the Coleman reissue patent, No. 11, 626; so far as it relates to patent to Coleman, No. 626,670; so far as it relates to patent to Coleman, No. 627,054; so far as it relates to patent to Coleman, No. 632,513; so far as it relates to claims 9, 11, 12, and 13 of the patent to Robinson & Green, No. 708,496; so far as it relates to patent to Robins & Jacoby, No. 771,748; so far as it relates to patent to Robins & Jacoby, No. 771,749; so far as it relates to patent to Grass, No. 880,020.

To take the accounting herein ordered, a master will, upon motion, be appointed.